(No. 72308

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CINQUE LEWIS, Appellant.

*Opinion filed January 19, 1995.—Rehearing denied May 30, 1995.*

306

Rita Fry, Public Defender, of Chicago (Emily Eisner, Assistant Public Defender, of counsel), for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee G. Goldfarb and Christine Cook, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Cinque Lewis, was convicted of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(2)) and armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2(a)). Thereafter, the same jury found defendant eligible for the death penalty and, further, that there were no mitigating facts sufficient to preclude death. Defendant was sentenced to death on the murder conviction and to a term of 30 years' imprisonment for the armed robbery conviction.

Defendant appealed directly to this court (Ill. Const. 1970, art. VI, § 4(b); Ill. Rev. Stat. 1991, ch. 38, par. 9—1(i); 134 Ill. 2d R. 603), and sentence has been stayed pending our review (134 Ill. 2d Rules 603, 609(a)). We affirm defendant's convictions and sentence for armed robbery; vacate his death sentence; and remand for a new death sentencing hearing.

Defendant asserts numerous errors at every phase of the proceedings. Rather than list them here, we will state each as it is considered in the opinion.

## FACTS

The following evidence was adduced at trial. Brunell Donald, age 15, testified that on November 5, 1985, she lived with her mother, Yvonne Donald, and younger sister, Quiana, in an apartment at 4848 North Winthrop Avenue in Chicago. Brunell was then 10 years old and in the fifth grade. On the afternoon of November 5, she was watching television when someone knocked on the door. Brunell asked and was given permission by her mother to answer. She went to the door, asked who was there, and heard a reply, "C.Q."

Brunell had seen C.Q. in the lobby of the apartment building on prior occasions. She had also heard his voice about 5 or 10 times before, once in her home, and most recently, on the morning of November 5, in the lobby of her apartment building. On that particular morning, Brunell had conversed with C.Q. concerning her mother.

Upon ascertaining C.Q.'s identity, Brunell asked her mother if she wanted her to open the door. Her mother responded affirmatively, reached into her back pants pocket and pulled out a key. Brunell took the key, unlocked the door and opened it. C.Q. was there. Brunell identified defendant in court as the person known to her as C.Q.

Once inside the apartment, defendant went into the living room and sat on the couch next to Yvonne Donald. Quiana, the younger child, lay sleeping next to Yvonne. Brunell continued watching television while defendant and Yvonne talked. Moments later Yvonne told Brunell to take the television and go into the "back room" (one of the bedrooms in the apartment). Brunell complied, leaving the door to the "back room" open.

Brunell continued watching television in the "back room." Upon hearing her mother scream, Brunell ran

into the hallway, where she saw "C.Q. over [her] mother stabbing her." As Brunell stood screaming, "C.Q. turn[ed] around and face[d] [her] and told [her] to stop." Brunell stopped screaming and defendant, again, started stabbing Yvonne. When Brunell started screaming again, defendant then told her to go to her room or he would kill both her and her mother. Brunell estimated her distance from defendant and her mother at the time to be about 25 feet.

Defendant turned back to Yvonne, "rolled her up and *** took the key out of her back pocket." He then went to the door and, with the knife and the key in his right hand, attempted to unlock the door. Unsuccessful in his attempt, he summoned for Brunell to open the door and handed her the key.

Brunell unlocked the door, leaving the key in the lock. Defendant then took the key, "turn[ed] it again," pulled it out of the lock and ran out of the apartment. Defendant took the key with him.

After defendant left, Brunell went over to her mother, and then telephoned her cousin, Tonya Chapman, who also lived in the building. After talking to Chapman, Brunell called the police.

When the police arrived Brunell gave them a description of defendant. She was able to describe defendant's height by pointing to an officer whom she perceived to be of comparable height to defendant. She did likewise in describing defendant's weight. Brunell further described for the officers what defendant was wearing, and told them his nickname and that he had a dark complexion. According to Brunell, on the day of the murder, defendant was wearing "a black long coat, blue jeans, black shoes, a white, kind of light shirt and dark glasses" and was carrying a cane. Additionally, defendant had a scar on the right side of his face "and it met his mouth."

Two days later, while at the home of her aunt, Eddie Cathey, Brunell again spoke with police officers. At that time, the officers showed her several photographs and asked if she recognized any of the persons pictured as the person who had stabbed her mother. Brunell chose defendant's picture.

In 1988, Brunell "picked out C.Q." in a police lineup.

On cross-examination, Brunell testified that she told police that her mother's assailant was about 29 or 30 years old. She also told the investigating officers at the crime scene, and the detectives at the police station at a later date, that her mother's assailant had a scar on his face. She denied telling police that the offender had a slight or skinny build; "[a]ll I knew [was] that I pointed to the police officer that looked his weight." Further, she did not recall telling the police that the assailant walked with a limp.

Brunell also testified that she told the officers at the scene that she had seen defendant that morning. However, she did not tell police, until 1988, about her conversation with defendant on the morning of the murder. Neither did she tell them that she had seen defendant on several prior occasions.

Chicago police officers Stephen Stukel and James Gildea arrived at the Donalds' apartment at 5:05 p.m. and 6 p.m., respectively. Officer Stukel noticed that the deadbolt lock on the apartment door was in the locked position. The bolt was down, but the door was open. Lighting conditions in the apartment at that time were good; it was daylight and there was a light turned on in the hallway of the apartment.

Two children were in the apartment. Brunell, the older child, appeared calm and Stukel attempted to obtain a description of the offender from her. Brunell gave police a general description of the offender, which facts, on the police report, reflected "male black" and

"scars unknown." Because Brunell did not understand numerical weights and heights, Stukel had her give height and weight descriptions by comparing the weight and height of police officers present during the investigation. Brunell additionally gave Stukel the name "C.Q." as the assailant and a "basic clothing description."

Gildea's testimony was substantially the same as Stukel's. On cross-examination, Gildea testified that in his November 5, 1985, supplemental report he described the offender as a black male, 29 to 30 years old, slender build, who walks with a slight limp. Nothing in his report indicated a scar. On redirect examination, Gildea testified that he did not recall whether he had specifically asked Brunell whether the assailant had scars.

Detective Robert Elmore of the Chicago police department testified concerning Brunell's selection of defendant's photograph from a five-picture array two days after the murder. Elmore's interview of Brunell on November 7 also included a description of the offender as a black male, "thin build," "slight limp," without indicating facial scarring.

Elmore also testified that in an interview with Kevin Keith, defendant's roommate, Keith told him that he had sold Yvonne Donald cocaine and that Donald owed Keith $200.

Officer Thomas Reynolds, a crime scene technician, testified that no weapons or fingerprints were recovered from the murder scene.

Dr. Tae An, an assistant medical examiner for Cook County, testified concerning the autopsy performed on Yvonne Donald. It was his testimony that the victim sustained 31 stab wounds and six cutting wounds, and that the cause of death was multiple stab wounds which lacerated internal organs. Over defense counsel's objection, Dr. An further testified to his internal examination of the decedent's genitalia, which revealed that she was five months pregnant.

Kevin Keith, defendant's roommate, testified that he met defendant during the summer of 1985. In early fall of that year, defendant, after being evicted from his apartment, moved in with Keith. Keith recalled that in 1985 defendant had a prominent scar on his face and periodically walked with a cane, although Keith never saw defendant limp.

Keith was acquainted with Yvonne Donald and had visited her apartment on two or three occasions, including once in October 1985 with defendant. He recalled a conversation with defendant in mid-October 1985 in which defendant told Keith that Yvonne Donald owed defendant $200 for cocaine. During that conversation, defendant claimed to have had difficulty collecting the money and said, "I'll kill the b- - - -." Keith denied that Yvonne Donald owed Keith any money.

On November 3, 1985, Keith was arrested for shooting a hole in the wall of his father's home during an argument. Keith remained in the Cook County jail until November 6. On his arrival home from jail, he met defendant, who was on his way out of the apartment. Defendant was carrying a large duffel bag and he indicated to Keith that he was on his way to the laundromat. Although defendant had not spoken of moving out, Keith never saw defendant again. Defendant left his stereo and a few articles of clothing at the apartment.

The next day, when Keith learned that Yvonne Donald had been killed, he made an anonymous telephone call to the police. He told the police dispatcher that he thought he knew who had killed a certain individual. Keith withheld his identity from police because he "was afraid that [he] thought [he] knew who had committed the murder and [he] did not know where that person was."

In a second phone call to police, Keith supplied his name and address and informed police that he thought Cinque Lewis had murdered Yvonne Donald.

In his third telephone call to police, Keith asked officers to pick him up at the Argyle El stop because he wanted to give them information. The police responded and transported Keith to the Area 6 police station. While at the station, Keith told detectives that he believed that defendant murdered Yvonne Donald.

On cross-examination, Keith acknowledged that on November 3, 1985, he was arrested for criminal damage to property and disorderly conduct. He further testified that he had used cocaine, but denied addiction, and that he had never been hospitalized for cocaine dependency. Keith stopped using cocaine in October 1985, and was not using cocaine either on November 3, the day of his disorderly conduct arrest, or on the day he made the three phone calls to police. Keith did not recall, however, whether he had stopped using cocaine before or after hearing defendant make the threat on the decedent's life.

Keith stated that although he had used cocaine and had had some problems with it, he got help for the problem. Following his November 3 arrest, he was given the option of remaining in jail or being evaluated at Lutheran General Hospital for cocaine addiction. After being evaluated, he saw Dr. Sellers, beginning on January 16, 1986, for a bi-polar affect disorder, for which Dr. Sellers prescribed Lithium.

Keith saw Yvonne Donald ingest cocaine and did so with her "maybe once." Contrary to Detective Elmore's testimony, Keith stated that he told Elmore neither that he had sold cocaine to the deceased nor that she owed him $200.

On redirect, Keith testified that although he was diagnosed as a manic depressive, he saw Dr. Sellers for less than a year on a limited number of occasions. His only symptoms were mood swings, which Keith described as "where you would be very, very happy for

awhile and then you would be very, very down for awhile." Specifically questioned about symptoms in October and November of 1985, Keith testified that he did not suffer any blackouts or memory loss. Keith was never required to have prolonged psychiatric treatment and he has never been institutionalized for psychiatric care.

Sergeant Paul Carroll of the Chicago police department also testified. According to Carroll, on October 21, 1987, he submitted defendant's fingerprints to the Federal Bureau of Investigation in order to locate any records of defendant in other jurisdictions within the country. The FBI informed Carroll that the fingerprints matched those of a person named Louis James Kirk, who was in custody in California. At Carroll's request, California authorities sent him a photograph of Kirk. Noting a facial scar in both pictures, Carroll determined that the man depicted in the California photograph was the same man as defendant. Extradition proceedings were commenced, and in June 1988, defendant was returned to Chicago from California.

Defendant presented no witnesses at the guilt phase of trial. Following the close of the evidence, the jury returned guilty verdicts on both the armed robbery and the murder charge.

The same jury found defendant eligible for the death penalty based on the presence of two statutory aggravating factors. (See Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(b)(3), (b)(6).) Finding no mitigation sufficient to preclude death, defendant was sentenced to death on the murder conviction and to a term of 30 years in prison on the robbery conviction.

Defendant raises in excess of 25 issues on appeal. We have categorized his claimed errors based upon the stage of the proceedings in which the claimed error occurred.

### JURY SELECTION

Defendant asserts that the trial court's refusal to "reverse-*Witherspoon*" or "life-qualify" prospective jurors constituted a denial of his right to due process. See *Morgan v. Illinois* (1992), 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222; *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770.

Prior to trial, defendant tendered several questions to the court designed to bring before the venire a "reverse-*Witherspoon*" inquiry. (See *Morgan*, 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222.) The questions were intended to discover and to cull from the venire those potential jurors who would automatically vote to impose the death penalty. The State, in turn, asked that the jury be "death-qualified" such that any juror who might automatically oppose death could be excused for cause. (See *Witherspoon*, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770.) The court initially reserved ruling on both parties' requests.

In a later ruling on defendant's motion to "life-qualify" the jury, the court expressed its intention to select the jury in its "usual fashion" and to ask both parties' tendered questions "at some point if [the court] felt they were appropriate." The court stated:

> "[I]initially I'm going to ask if someone indicates that they have some difficulty with the imposition of a death penalty, I will ask them is your opposition to the extent as such that you would automatically vote against a sentence of death for any person regardless of the facts of the case and other questions I deem appropriate."

During *voir dire*, the court questioned each potential juror concerning his or her scruples against imposing death. However, the court asked only one juror a "life-qualifying" question. That juror was ultimately excused for cause by the State.

The State does not complain concerning defendant's entitlement to the "reverse-*Witherspoon*" inquiry.

Indeed, that such a right is available to capital defendants is no longer subject to question. (See *People v. Johnson* (1994), 159 Ill. 2d 97, 130-35; *People v. Cloutier* (1993), 156 Ill. 2d 483, 497-500; *People v. Smith* (1992), 152 Ill. 2d 229, 273-74.) Additionally, although at the time of defendant's trial he had no right to a "reverse-*Witherspoon*" inquiry, *Morgan*, which was decided during the pendency of defendant's case, applies retroactively to vest defendant with such right. (See *People v. Brisbon* (1985), 106 Ill. 2d 342, 359-60; *Cloutier*, 156 Ill. 2d at 497-98.) Further, the State makes no suggestion that the substance of defendant's tendered questions is inadequate to "life-qualify" the jury. In that regard, we note their adequacy for that purpose. See *Cloutier*, 156 Ill. 2d at 499.

The State does argue, however, that the trial court never refused to "life-qualify" the jury. In the State's view, the court merely exercised its discretion in not doing so. The State then urges waiver for defendant's failure to continue to press the issue after the court stated its decision to take defendant's questions under advisement.

We reject the State's argument as disingenuous. The practical effect of the court's "exercise of discretion" is that defendant was denied the right to "life-qualify" the jury, pure and simple. The court's final ruling on the matter was that it would ask the questions if it deemed them appropriate. It apparently never deemed them so. However, *Morgan* requires that a defendant, *upon his request*, be afforded the opportunity to inquire into prospective jurors' opinions in support of the death penalty. (*Morgan*, 504 U.S. at 729-35, 119 L. Ed. 2d at 503-06, 112 S. Ct. at 2230-32.) Furthermore, defendant was not required to persist in his demand once the court had announced its decision to proceed in its "usual fashion." We do not find waiver.

Defendant, upon his request, was entitled to a "reverse-*Witherspoon*" inquiry. His request having been denied, his death sentence must be vacated and the cause remanded for a new sentencing hearing. See *Johnson*, 159 Ill. 2d 97; *Cloutier*, 156 Ill. 2d 483; *Smith*, 152 Ill. 2d 229.

### GUILT PHASE

Defendant alleges in excess of 11 errors at the guilt phase of trial, the presence of any one, he maintains, entitles him to a new trial.

He initially contends that he was denied a fair trial. In that regard, he first urges reversible error in the trial court's denial of his request for a continuance. Defendant maintains that the continuance was necessitated by the State's late disclosure of psychiatric records of one of the State's key witnesses, Kevin Keith. Denial of the continuance deprived defendant of his right to effective cross-examination and due process. Defendant makes no contention that the State failed during discovery to timely disclose Kevin Keith as a witness.

The record reveals that trial in this matter was scheduled to commence on March 5, 1991. Prior to proceeding with the trial, defendant advised the court that on the preceding day, March 4, 1991, the State learned from Keith and disclosed to defendant that Keith had been hospitalized and had received psychiatric treatment in mid-December 1985. Defendant advised the court that, in light of this evidence, he could not be ready to proceed with trial until March 25, 1991.

The State acknowledged the existence of medical records which reported Keith's 28- to 30-day hospitalization for substance abuse and a diagnosis of him as manic depressive. Further, the State offered that Keith would be willing to testify at trial concerning the hospitalization.

The trial court ordered the medical records produced without ruling upon defendant's motion for continuance.

The following day, the State tendered Keith's medical records. The medical records have not been made a part of this record; however, the trial court noted that the records consisted of notes from Keith's treating physician, Dr. Sellers, two letters from him to a circuit court social worker, dated February 15 and December 9, 1986, and three pathology specimen consultation reports on urine specimens received April 14, 1986, June 30, 1986, and December 3, 1986.

Defendant informed the court that he had received the reports on that morning and that he was not ready to proceed with trial. Defendant asserted that he needed to have a psychiatrist read the reports and to consult with the psychiatrist in order to effectively prepare cross-examination of Keith.

In response, the State offered that Dr. Sellers was available for consultation on that date and could be made available to defendant. Additionally, the State noted that it had drafted a subpoena compelling the doctor's appearance in court on the morning of March 7.

Concerning the medical records, the court stated:

"They are not that long. Basically, it would take a person maybe five minutes to read the whole set of reports here. Basically, Dr. Sellers has maybe a page of handwritten notes that includes his entire report. The relevance of it is a screening sheet that's mostly typewritten. There is some written information in there, but it won't take a person very long to read any of this. Most of it is self-explanatory."

The court acknowledged that defendant was entitled to consult with a doctor of his choice concerning the records. Further, the court allowed that the medical reports could be presented to the jury. However, the

court did not see "any real necessity" to delay the proceedings. In so concluding, the court noted that the jury had not yet been picked and defendant, therefore, had time to submit the reports to a doctor of his choice. The court stated, however, he had to do so "within the parameters of trial." The court then denied defendant's motion for continuance.

Jury selection commenced and was completed on March 7. Trial commenced that same day and recessed on Friday, March 8. (The time of Friday's adjournment is not indicated by the record; however, the trial judge commented that adjournment was "quite early," and the record reflects that it occurred soon after the lunch recess.) Court was reconvened on Monday, March 11, at which time defendant declared that he had no evidence to present. Dr. Sellers was not called to testify.

Defendant asserts that he was prejudiced because Keith, the State's key witness, provided uniquely damaging evidence of "flight," "admissions," and motive to commit the murder, and his accusations led to defendant's arrest. He argues that a witness' psychiatric history is relevant to his credibility. The absence of an opportunity to fully explore Keith's psychiatric history, defendant maintains, amounted to a denial of due process, as defendant was at a "loss on how to proceed." A continuance would have afforded him the preparation to which he was entitled.

The constitutional right of the accused to have the assistance of counsel carries with it the right of counsel to have adequate time to prepare the defense. (*People v. Lott* (1977), 66 Ill. 2d 290, 297.) On a charge of murder, where the prosecution is seeking the death penalty, every reasonable opportunity should be given the defendant to investigate witnesses against him and to prepare his defense. (*People v. Crump* (1955), 5 Ill. 2d 251, 263.) It is, of course, settled in Illinois, however, both by

legislative enactment (Ill. Rev. Stat. 1991, ch. 38, par. 114—4(e)) as well as by judicial edict (*People v. Davis* (1970), 45 Ill. 2d 514, 519; *People v. Latimer* (1966), 35 Ill. 2d 178, 181), that the granting of a continuance for additional trial preparation is a matter resting within the sound judicial discretion of the trial court. Where it appears that the refusal of additional time in some manner embarrassed the accused in the preparation of his defense and thereby prejudiced his rights, a resulting conviction will be reversed. See *People v. VanNorman* (1936), 364 Ill. 28, 31; see also *Crump*, 5 Ill. 2d 251 (holding that denial of continuance was unreasonable where defendant had 10 to 11 days to investigate 48 witnesses, prepare cross-examination, and prepare defense in chief).

In analyzing defendant's claimed error, we have examined prior decisions which have considered this issue. If there is one general principle to be gleaned from those decisions, it is this: where there is sufficient evidence to support a finding of guilt, the denial of a continuance will not constitute reversible error. See *VanNorman*, 364 Ill. 28 (defendant not prejudiced by denial of continuance where identification of defendant was positive and defendant's confession was complete, leaving no doubt of defendant's guilt); *People v. Amos* (1990), 204 Ill. App. 3d 75 (denial of continuance to procure impeachment witness held not reversible error where verdict did not hinge on impeachment of particular aspect of testifying witness' testimony); *cf. People v. Cobb* (1983), 97 Ill. 2d 465 (finding that the denial of a continuance to secure the prosecution's "most important witness," whose testimony, if believed by the jury, *standing alone*, would have been sufficient to convict the defendants, constituted reversible error).

Without question, Keith was an important State witness. However, his testimony on the defendant's flight

and motive, while supportive, was not the heart of the State's case. It was Brunell's testimony which, standing alone, was sufficient to convict this defendant.

Further, we notice that in his opening statement to the jury, defense counsel argued the fact of Keith's "cocaine addiction" and depression. Additionally, on cross-examination, defense counsel examined Keith on both issues. Defendant's presentation of this evidence likely served, to some extent, to diminish Keith's credibility. Even accepting that an independent psychiatric opinion would have served to further diminish Keith's credibility, such evidence could yet not overcome the strength of Brunell's eyewitness testimony.

In concluding our consideration of this issue, we find it significant that the State presented no expert on the issues of Keith's substance abuse and psychiatric treatment. Error, if any, in denying defendant a continuance was harmless beyond a reasonable doubt.

Defendant's second argument in support of his unfair-trial claim is that the State injected prejudicial and inflammatory evidence of the victim's pregnancy into the trial. He maintains that as the victim's pregnancy was not an issue in the case, this matter was unfairly presented to appeal to the jurors' sympathy for the victim and to create a sense of outrage against defendant. Further, he argues, the trial court's ruling during trial of the evidence's admissibility suggested to the jury that such evidence was significant. He urges that its admission constituted reversible error.

Dr. An testified as follows:

"MR. JONKER [Assistant State's Attorney]: As part of that internal examination, doctor, did you examine what's known as the genitourinary system?

WITNESS: Yes.

MR. JONKER: What is the genitourinary system?

WITNESS: Genitourinary system means genital system and the urinary system including female genitalia and the kidneys.

MR. JONKER: What did your examination of Yvonne Donald reveal concerning that genitourinary system?

MR. STRUNK [Defense Counsel]: Objection, Judge. May I have a side bar?

COURT: Yes, you may. Excuse us one minute, ladies and gentlemen.

\* \* \*

COURT: \*\*\* Ladies and gentlemen, the objection will be overruled.

MR. JONKER: Once again Doctor An, what were the results of your genitourinary system examination?

WITNESS: On the examination of the genitourinary system I observed she was pregnant. And the fetus was a female fetus measuring 25 centimeters in length. The fetus was gestation at five months."

The State maintains that this was testimony of the victim's physical condition discovered during an autopsy and was, therefore, relevant.

Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence. (*People v. Monroe* (1977), 66 Ill. 2d 317, 322.) However, even when evidence is relevant, it may, in the trial court's discretion, be excluded if its prejudicial effect substantially outweighs its probative value. (*People v. Eyler* (1989), 133 Ill. 2d 173, 218.) In this context, prejudice means " 'an undue tendency to suggest decision on an improper basis, commonly an emotional one, such as sympathy, hatred, contempt, or horror.' " *Eyler*, 133 Ill. 2d at 218, quoting M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 403.1 (4th ed. 1984).

Dr. An testified that the cause of the victim's death was multiple stab wounds. Certainly, the additional evidence of the victim's pregnancy was not relevant on that issue. We agree with defendant—the pregnancy evidence bore absolutely no relationship to defendant's guilt or innocence for the victim's murder. This evi-

dence, had it been properly excluded, would have netted no appreciable damage to the State's case.

In response to defendant's argument that the pregnancy bore no relation to the victim's death, the State responds that neither did the facts of her gender, weight, and that she had no needle marks. Yet, the State argues, this type of evidence is unquestionably admissible.

We note, however, that the victim's gender, weight and the fact that she had no needle marks are factors not capable of evoking the same emotional response as is evidence that the victim was pregnant at the time of her murder. The moral fabric of this society has not so deteriorated that we now perceive the loss of life as common a fact as one's gender or weight. No valid purpose was served by admission of this evidence, and we reject the State's arguments to the contrary. We therefore consider its prejudicial effect.

This court has condemned the introduction of otherwise irrelevant information about a crime victim's personal traits or familial relationships at the guilt phase of trial. (See *People v. Hope* (1986), 116 Ill. 2d 265, 274-77 (prosecutor referenced fact that murder victim was survived by wife and three children); *People v. Bernette* (1964), 30 Ill. 2d 359, 370-73 (evidence that the decedent had a wife and children); *People v. Dukes* (1957), 12 Ill. 2d 334, 340 (son of the decedent testified concerning decedent's wife and family).) We recognize, however, that not every mention of a victim's personal traits will automatically vest in a defendant the right to a new trial. *People v. Williams* (1991), 147 Ill. 2d 173, 229.

As a preliminary matter, we are aware that the evidence here of the decedent's pregnancy is somewhat different in character from that presented in *Hope, Bernette* and *Dukes*. This case, though procedurally

analogous to those cases, is more factually analogous to *People v. Evans* (1988), 125 Ill. 2d 50, where, during the second phase of the defendant's sentencing hearing, the prosecutor commented to the jury that the victim was pregnant. Notwithstanding the differences in character, evidence that a murder victim was pregnant at the time of her murder is no more welcome than evidence that the victim left behind a family. In either case, such evidence creates an unnecessary risk of undermining the fairness and impartiality of the proceeding. Given the comparable concerns, we subject the improperly admitted evidence here to the same scrutiny and analysis as was applied in *Dukes* and that line of cases.

The analysis, as first stated in *Filippo v. People* (1906), 224 Ill. 212, 217, requires the reviewing court to consider whether the prejudicial evidence is elicited incidentally. Where this type of evidence is presented in such a manner as to cause the jury to believe it is material, its admission is highly prejudicial and constitutes reversible error unless an objection thereto is sustained and the jury instructed to disregard such evidence. *Bernette*, 30 Ill. 2d at 371.

Incidentally, *Bernette* and *Dukes* were decided prior to the changes in our capital sentencing procedures. Prior to 1976, a defendant's guilt and sentence were determined in a single proceeding. (See Ill. Rev. Stat. 1971, ch. 38, pars. 9—1(b), 1—7(c)(1).) Since *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909, capital trials in this State have been conducted on a bifurcated basis. (See Ill. Rev. Stat. 1983, ch. 38, par. 9—1(d).) Notwithstanding the changes in capital sentencing procedures, the test of prejudice as announced in *Filippo*, and as applied in *Bernette* and *Dukes*, remains viable. See *Hope*, 116 Ill. 2d at 276-78.

Defendant urges that his case is wholly analogous to *Bernette* and that, therefore, the same result, reversible

error, should obtain. In *Bernette*, the widow of the murder victim was called by the State to testify. In response to the prosecution's questions, the widow testified that: she lived with her four children and a baby-sitter; her oldest child was six years and the youngest seven months; and the youngest was the only one of the children born of her marriage to the deceased. Further, during final argument, the prosecutor argued the consequences suffered by the victim's family to the jury.

We have additionally considered *Hope*, a case in which conduct similar to that in *Bernette* also resulted in reversal. There, throughout the guilt phase of trial, the prosecutor made reference to and elicited testimony regarding the murder victim's family. Not only did he reference the family in his opening statement, but he did so in direct examination of the decedent's widow and of another witness. Further, he had admitted into evidence a photograph of the decedent and his family. And, finally, he referenced the family in his closing argument. In reversing the defendant's convictions, the court noted that the evidence of the decedent's family was presented in a series of questions in such a method as to permit the jury to conclude the information material.

We disagree that the case at bar is analogous to *Bernette* and, further, find it also distinguishable from *Hope*. Here, unlike in *Bernette* and *Hope*, the prosecutor did not dwell on the fact of the victim's pregnancy. Only one question was propounded to elicit the prejudicial testimony. In both *Bernette* and *Hope*, however, several questions were asked of the decedents' wives, and in *Bernette*, the prosecutor even went "to the extreme of eliciting the ages of the children involved." Additionally, here, unlike in *Bernette* and *Hope*, the testimony was not presented by a member of the victim's family. It was, instead, presented as part of the medical

examiner's autopsy testimony. As such, the evidence was not laden with the same level of emotional overtone as was the testimony in *Bernette* and *Hope*. Finally, here, unlike in *Bernette* and *Hope*, the prosecutor did not argue the fact of the victim's pregnancy to the jury either in opening or in closing argument. Thus, the impact of the error was not further exacerbated. (See *People v. Free* (1983), 94 Ill. 2d 378, 414.) In both *Bernette* and *Hope*, however, the prosecutor commented in argument to the jury on the victims' families.

Defendant asserts, and we do not disagree, that his overruled objection to this testimony, in the presence of the jury, tended to amplify its materiality. (See *Hope*, 116 Ill. 2d at 278 (in overruling objections to improper evidence prejudicial effect was amplified); see also *Dukes*, 12 Ill. 2d at 340 (jury assumed to have deemed evidence material where objections to its admissibility were overruled).) Nevertheless, measured against the conduct in *Bernette* and *Hope*, we cannot conclude that the manner in which the evidence here was presented unduly focused the jury's attention on the materiality of this evidence.

In our view, admissibility of this evidence, though irrelevant and prejudicial, did not substantially compromise defendant's right to a fair and impartial trial.

In a footnote, defendant argues that he was "doubly prejudiced" by this error. He contends that since the feticide count had been dismissed, he presumed that pregnancy evidence would not be presented. Therefore, he did not request appropriate inquiry during *voir dire* into the potential jurors' attitudes on prenatal life issues. Any "pro-life" juror, therefore, remained undetected and may have voted to convict him on an improper basis.

Regardless of any error in admitting the pregnancy evidence, feticide is not an issue in this case. *Voir dire*

on the subject would not only have been improper, but would also have compounded the error. See *People v. Howard* (1991), 147 Ill. 2d 103, 135-36 (use of handgun properly excluded as question in *voir dire* where such was not a central issue at trial); *cf. People v. Stack* (1986), 112 Ill. 2d 301 (reversible error to refuse to question potential jurors on insanity defense, an issue in the case).

Moreover, we deem defendant's *voir dire* issue waived. Subsequent to *voir dire*, but prior to commencement of trial, the court ruled adversely to defendant on his motion to preclude evidence of the victim's pregnancy. Defendant made no assertion, during pretrial or in his post-trial motion, that *voir dire* was rendered either inadequate or incomplete as a result of the court's ruling. (*Cf. People v. Hobley* (1994), 159 Ill. 2d 272, 299 (upholding the propriety of reopening *voir dire*).) Defendant's footnoted claim is raised here for the first time on appeal; the issue is, therefore, waived. *People v. Enoch* (1988), 122 Ill. 2d 176, 186.

Defendant next contends that the admission of Keith's testimony concerning defendant's alleged statement, "I'll kill the b- - - - ," was reversible error. He maintains that the statement was impermissible hearsay offered and improperly admitted for the proof of the matter asserted.

The State responds that any error in the admissibility of this statement on the grounds that it was hearsay is waived for defendant's failure to object on this basis at trial.

Defendant replies that, generally, his objections on grounds of lack of "foundation," "speculation," "lack of trustworthiness," and "foundation, it's hearsay" convey his tendency to loosely use these terms interchangeably. He apparently argues, therefore, that even though he did not specifically object on the basis of hearsay, such basis should, nonetheless, be inferred.

Initially, we note that defendant's "foundation, it's hearsay" objection was not asserted to bar the statement challenged here, but rather was in response to other of the State's evidence not at issue here. The basis for defendant's trial objection to the statement now at issue was clearly that it lacked trustworthiness because Keith was unable to provide the date on which the statement was made. Defendant's specific legal basis for the objection was that no proper foundation had been laid for admissibility of the statement.

An objection to the admissibility of evidence because it lacks a proper foundation is not synonymous with an objection that the proffered evidence is hearsay. In fact, the "lack of foundation" objection may be employed at trial with respect to at least each of the following: competency of a lay witness, personal knowledge, qualification of an expert witness, and relevancy, as well as satisfaction of a hearsay exception. The terms are not, as defendant suggests, interchangeable. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 611.18 (6th ed. 1994).

Here, defendant's objection was to the effect that evidence already presented was insufficient to support introduction of the statement, *i.e.*, no date for the making of the statement was supplied prior to its introduction, *i.e.*, no proper foundation was laid for its introduction. (See M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 611.18 (6th ed. 1994).) There was no objection to the substance of the statement as constituting hearsay, and we decline to infer such from defendant's "loose" use of terms.

It is settled that a specific objection to the admission of evidence waives all grounds not specified. (*People v. Barrios* (1986), 114 Ill. 2d 265, 275; *People v. Garcia* (1983), 97 Ill. 2d 58, 86; *People v. Curry* (1973), 56 Ill. 2d 162, 170; *People v. Canaday* (1971), 49 Ill. 2d 416, 423-

24.) Equally as settled is that the failure to object on proper grounds at trial results in waiver of the issue through "procedural default." (See *People v. Coleman* (1989), 129 Ill. 2d 321, 340; see also *People v. Lane* (1963), 29 Ill. 2d 326, 331.) Defendant, having based his objection to the statement on a lack of foundation, may not now assert hearsay as the basis on appeal. (See *Lane*, 29 Ill. 2d at 331.) Defendant's hearsay objection is waived.

Further, and contrary to defendant's assertion, plain error is not available in this case as a mechanism by which he may avoid waiver. We do not deem the evidence here to be closely balanced or the error, if any, of such magnitude as to have denied defendant a fair trial. See *Enoch*, 122 Ill. 2d at 190; 134 Ill. 2d R. 615(a).

Defendant next assigns error in the trial court's admission of Keith's testimony concerning Keith's three phone calls to police. Defendant maintains that the testimony constituted prior consistent statements which were inadmissible to bolster Keith's testimony.

Although generally objected to in his post-trial motion, defendant voiced no objection to the admissibility of this testimony at trial. Both are required to avoid waiver. See *Enoch*, 122 Ill. 2d at 186.

Defendant next urges an insufficiency in the evidence supporting his armed robbery conviction.

In reviewing the sufficiency of evidence to sustain a conviction, the relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) We believe the evidence here was sufficient to support defendant's armed robbery conviction.

In support of his insufficiency argument, defendant offers that there was no evidence of an intent to rob. He asserts that the removal of the key from Yvonne

Donald's pocket was for the purpose of opening the locked apartment door, and not to deprive the decedent of her property. In his reply brief, defendant urges that the thrust of his argument is the "obvious absence of a general intent" to take the key where he had given the key to Brunell and it was merely used to open the door. Absent a showing of a general intent, defendant argues, the armed robbery conviction must be reversed.

Robbery is a general intent crime. (*People v. Banks* (1979), 75 Ill. 2d 383, 388-92.) " '[G]eneral intent exists when from the circumstances the prohibited result may reasonably be expected to follow from the offender's voluntary act, irrespective of any subjective desire to have accomplished such result.' " (*People v. Talley* (1988), 177 Ill. App. 3d 170, 173, quoting *Louisiana v. Daniels* (1958), 236 La. 998, 1007, 109 So. 2d 896, 899.) Unlike specific intent crimes, proof that the prohibited harm was intended is not necessary to proof of a general intent crime. See *People v. Garland* (1993), 254 Ill. App. 3d 827 (mental state is essential element of specific intent crime); see also *People v. Jackson* (1979), 76 Ill. App. 3d 1034 (armed robbery proved by showing defendant took property by use or threat of force while armed with dangerous weapon).

Defendant relies in particular on *People v. Tiller* (1982), 94 Ill. 2d 303, as additional support for his claim of insufficient evidence. In *Tiller*, the defendant had left the crime scene prior to his codefendant's murdering the victim. When the defendant later returned, he took the murdered victim's vehicle. This court reversed the defendant's armed robbery conviction. In so doing, the court stated that reversal was necessary because "there [was] no evidence to show that the force exerted against [the victim] was for the purpose of depriving her of the [property taken]."

This court has since, however, expressly repudiated that statement in *Tiller* as unnecessary to its holding. (See *People v. Strickland* (1992), 154 Ill. 2d 489, 525.) The court noted in *Strickland* that the statement in *Tiller* was at odds with this court's earlier rationale in *People v. Jordan* (1922), 303 Ill. 316.

In *Jordan*, the defendants challenged their robbery convictions claiming a lack of evidence that their attack on the victim was for the purpose of robbery. The defendants asserted that any money taken from the victim was an afterthought and was accomplished without any violence, force or intimidation. In sustaining the defendants' convictions, the court reasoned that, "[i]f, as the result of a quarrel, a fight occurs in which one of the parties is overcome, and the other then, *without having formed the intention before the fight began*, takes the money of the vanquished one, the offense committed is robbery." (Emphasis added.) *Jordan*, 303 Ill. 2d at 319.

Having recently realigned the decisions in this area of the law, we intend no deviation. Consistent with *Jordan* and *Strickland*, we hold that proof that robbery was intended is not required to sustain a conviction for armed robbery. The gist of armed robbery is simply the taking of another's property by force or threat of force. *Banks*, 75 Ill. 2d at 391-92; see also Ill. Rev. Stat. 1985, ch. 38, pars. 18—1, 18—2.

Further, to the extent that defendant attempts to argue that a break in the chain of events negated the elements of robbery, we reject it. Notwithstanding any assistance solicited from Brunell, the offenses committed by defendant were essentially a single series of continuous acts. Significantly, after Brunell's brief and compelled assistance, defendant turned the key, pulled it from the lock and ran with it from the apartment.

Defendant additionally argues that the evidence did not sustain the conviction because the taking of the key

from the decedent's pocket after her death was not accomplished by threat or use of force. In support of this argument, defendant offers that there was no announcement of a holdup, and no threats to force the decedent to surrender the key.

Force or threat of force is an element of the offenses of robbery and armed robbery. (Ill. Rev. Stat. 1985, ch. 38, pars. 18—1, 18—2.) This court has held that the necessary force or threat of force must be used as a means of taking the property from the victim. (*Tiller*, 94 Ill. 2d at 316.) As long as there is some concurrence between the defendant's threat of force and the taking of the victim's property, a conviction for armed robbery is proper. See *People v. Williams* (1987), 118 Ill. 2d 407, 416.

*Strickland* is instructive. In *Strickland*, the defendant fatally shot a police officer and then took the officer's gun. On appeal, the defendant argued that the conviction required reversal because the evidence did not establish that the force exerted was intended or used as a means of taking the officer's gun. In rejecting this argument, this court held that given the series of events, the necessary concurrence between the defendant's use of force and taking the victim's property was sufficient to support the conviction. In so concluding, this court quoted *Jordan*, stating, " '[t]he fact that the defendant [*sic*] had been reduced to a state of physical non-resistance before his money was taken does not relieve the crime of the quality constituting robbery.' " (Emphasis added.) *Strickland*, 154 Ill. 2d at 524, quoting *Jordan*, 303 Ill. at 319; accord *People v. Blake* (1991), 144 Ill. 2d 314 (defendants' use of threat and force against victims in upper level of house during codefendant's removal of property held essentially a related series of acts establishing the necessary concurrence of events to constitute armed robbery).

Here, as in *Strickland*, the stabbing and the taking of the key were essentially a single series of continuous acts committed by defendant. As *Strickland* teaches, the fact that the victim did not resist at the time of the taking does not negate the character of the offense as robbery. The necessary concurrence between the stabbing and taking the key was present and could properly support a conviction for armed robbery. *Cf. Tiller*, 94 Ill. 2d 303 (armed robbery conviction of defendant convicted of murder on accountability theory reversed where defendant had left scene before murder was committed by codefendant and only later returned to take victim's vehicle).

Furthermore, that there was no demand or threat of a holdup is of no moment. The defendant in *Williams*, 118 Ill. 2d 407, asserted a similarly unavailing argument.

Having reviewed the evidence, we conclude that any rational trier of fact could find the *essential elements* of armed robbery, *i.e.*, taking property by force or threat of force. Nothing more is required to sustain the conviction. The essential elements having been proved, the State has met its burden. The evidence is sufficient to support defendant's armed robbery conviction. See *Collins*, 106 Ill. 2d at 261.

Defendant further challenges the validity of his convictions on the grounds that the court denied him the opportunity to present evidence that someone else committed the charged offenses. He first assigns error in the trial court's preclusion of testimony of three Chicago police officers concerning their investigation of another suspect. According to defendant, the other suspect's appearance matched the description given of the offender at the time of the incident.

The proffered testimony concerned a one-page police investigation report which was read into the record.

The report detailed the three officers' contact with Daryl Bell, a friend of a friend of the victim, and their investigation of information obtained from Bell. In sum, the report provided: Daryl Bell gave police the name of Pat McGee as a suspect in this murder. Bell identified McGee from police photographs and informed them that McGee was living in the Cabrini Green housing projects. Two addresses for McGee were checked and determined to be "bogus."

The report additionally provided that Bell told police that McGee had an injury to his right thigh, possibly resulting from a cut or stab, that he was walking with a cane, and that his right arm was bandaged. According to Bell, McGee told Debra Crosby, of 4848 North Winthrop, that he was beaten by "gangbangers" in Evanston. The report further stated that Evanston police had no such report.

Defendant made an offer of proof, essentially consisting of the contents of the report. After receiving the offer, the court noted that the officers themselves could testify neither concerning McGee's injuries nor that he walked with a cane. Further, the court noted that Bell was not present at the murder, and is merely a friend of a friend of the victim. The court concluded that the information in the report was unreliable and, as such, would be improper to present to the jury.

We agree with the trial court's assessment of this evidence. Certainly, "[a]n accused *** may attempt to prove that someone else committed the crime with which he is charged [citation], but this right is not without limitations." (*People v. Ward* (1984), 101 Ill. 2d 443, 455.) Generally, the test for admissibility of evidence is whether such evidence tends to prove the particular offense charged. (*People v. Peter* (1973), 55 Ill. 2d 443, 459.) "[W]hether what is offered as evidence will be admitted or excluded depends upon whether it tends to

make the question of guilt more or less probable." (*Ward*, 101 Ill. 2d at 455.) Where the offered evidence is uncertain or speculative, the trial court, in its discretion, may properly reject it. *Ward*, 101 Ill. 2d at 455-56, see also *People v. Dukett* (1974), 56 Ill. 2d 432, 450.

There is no evidence connecting McGee to this murder. The information received by police concerning McGee's injuries and his use of a cane came to them, only indirectly, through Bell. The police never met McGee and apparently were not able to verify information given them by Bell. As such, the evidence that McGee was a suspect in this murder was too speculative and was, therefore, properly excluded.

In further support of his misidentification theory, defendant asserts that the trial court erred in precluding certain evidence included in the June 1988 police arrest report. Defendant finds significant that in the space provided on the arrest report for the description of the arrestee, the box for "heavy" build was checked instead of the boxes marked either "slender" or "medium." Yet, the description of the assailant, as reflected on the November 1985 incident reports, denotes a "slender" build. Defendant urges these facts as inconsistencies supporting admission of the arrest report.

In further support of the admissibility of the reports, defendant directs our attention to section 115—12 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1991, ch. 38, par. 115—12). Relying on section 115—12, he argues that testimony of observations from police officers of the physical appearance of the person arrested is "relevant and admissible."

As a preliminary matter, we note our agreement with the State—defendant misperceives the utility of section 115—12. Section 115—12 is a statutory exception to the hearsay rule which allows for the admissibility of prior identification evidence. (Ill. Rev. Stat. 1991,

ch. 38, par. 115—12; see also 6 L. Pieczynski, Illinois Practice § 23.68 (1989).) Born out of this court's decision in *People v. Rogers* (1980), 81 Ill. 2d 571, the rule is designed to permit the use of prior *consistent* out-of-court statements as corroborative or substantive evidence of a witness' prior identity of a defendant. (See *People v. Holveck* (1990), 141 Ill. 2d 84, 104-05; *People v. Hayes* (1990), 139 Ill. 2d 89, 140; M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 611.16 (6th ed. 1994); see also *People v. Davis* (1985), 137 Ill. App. 3d 769, 771.) Defendant's proffer of the arrest report description was neither corroborative of Brunell's prior identification of defendant nor was it substantive evidence of such. The rule has no application here.

To support his theory of misidentification, defendant sought to rebut Brunell's November 1985 identification, as recorded on the incident reports, with identification information included on a June 1988 arrest report. The trial court deemed the arresting officers' description on the arrest report irrelevant for that purpose. We agree.

Given the $2^1/2$-year period between Brunell's identification and defendant's arrest, the arrest report had little or no tendency to prove defendant's misidentification theory. Even if Brunell's verbal description of defendant's body type suffered from inaccuracies, there was no similar infirmity in her ability to recognize defendant's face. More than $2^1/2$ years after her initial description of "C.Q." to police, Brunell continued to recognize the face of defendant as that of her mother's assailant.

Considering the lapse of time between Brunell's initial identification and defendant's arrest, the method employed by police to obtain from her a description of defendant's body type, and the fact that Brunell positively identified defendant, both before and after his arrest, we conclude that the arrest report was not proba-

tive on the issue of identification. Defendant was not prejudiced by its preclusion.

Defendant next contends that the jury venire was tainted when the trial court "inadvertently" informed the venire that witnesses from Folsom Prison and the Alameda County and Oakland police departments would be testifying. Defendant's motion to strike the venire was denied.

Defendant argues that "[i]n view of the unquestionable folklore surrounding Folsom Prison, in particular, the venire could only have wondered, if not assumed, that Mr. Lewis was a convicted felon." It is defendant's contention that the trial court erred in insinuating that defendant had engaged in "collateral criminal activity." Further, defendant asserts, the error could not be cured without further tainting the venire. He maintains that reversal is required.

The State responds that the trial court's information to the jury concerning the witnesses was proper in order to discover if any prospective juror knew a witness. Further, the State points out, as did the trial court, that the court did not inform the jury which party would be calling the California witnesses. Therefore, the State concludes, as did the trial court, defendant was not prejudiced by the court's information to the venire.

We agree with the State. We additionally note that the constitution requires that every defendant be tried before a fair and impartial jury. In partial satisfaction of this mandate, potential witnesses must be identified and any associations between the jurors and these witnesses explored. See 6 L. Pieczynski, Illinois Practice § 25.45 (1989).

However, even assuming an irregularity in the selection of jurors, reversal is not required unless it appears that the defendant has in some way been prejudiced. (*People v. Ward* (1965), 32 Ill. 2d 253, 259-60.) Given the

compelling eyewitness testimony which the jury heard, defendant's conviction is not likely the result, instead, of the jury having heard the limited witness information.

Defendant argues further that the trial court need only have given names of the potential witnesses without further identifying occupations and places of employment. Perhaps such limited information would have been appropriate to guard against any potential unfairness to defendant. However, fairness and impartiality do not require that potential jurors be totally ignorant of the facts of the case before they assume their roles as jurors. (*People v. Del Vecchio* (1985), 105 Ill. 2d 414, 429.) Notably, during *voir dire*, the trial court ascertained each potential juror's ability to judge fairly and impartially on the evidence presented at trial. Any prejudice to defendant in this regard was minimal.

Defendant additionally contends that certain other disclosures to the jury denied him a fair trial. In that regard, he first argues that testimony disclosing that he was in custody in California, as well as testimony concerning extradition procedures, was prejudicial.

Over defendant's objection, the State was permitted to present evidence that an FBI fingerprint check revealed that defendant was in custody in California, along with the details of the extradition procedure. The trial court ruled such evidence was properly admissible to demonstrate steps in the police investigation. Defendant maintains, however, that the jury could infer prejudicial prior criminal activity from this evidence.

The State posits that because the jury was not given the reason for defendant's custody in California, there was no resulting prejudice.

We disagree with the State's assessment of the potential prejudicial effect of the evidence of defendant's custodial status. This court has held that evidence which

suggests or implies that the defendant has engaged in prior criminal activity should not be admitted unless somehow relevant. The fact that such evidence comes to the jury by way of inference does not alter its potentially prejudicial character. (See *People v. Lehman* (1955), 5 Ill. 2d 337 (where court considered prejudicial effect of inference that defendant was intending other criminal conduct).) Though incidental and nonspecific in nature, the jury could have inferred from the evidence presented here that defendant had been engaged in prior criminal activity. See *People v. Bryant* (1986), 113 Ill. 2d 497, 514 (evidence of police officer's prior acquaintance with defendant could support inference of a prior criminal record); see also *People v. Stover* (1982), 89 Ill. 2d 189, 196.

The State additionally offers as dispositive the general rule concerning the admissibility of investigation evidence. The rule, most recently stated in *People v. Hayes* (1990), 139 Ill. 2d 89, 130, is that the steps in the investigation of a crime and the events leading up to an arrest are relevant when necessary and important to a full explanation of the State's case to the trier of fact.

At first blush, the rule appears to mesh comfortably with those rules which govern the admissibility of other-crimes evidence. Here, other-crimes evidence is incorporated for the purpose of explaining the period between Brunell's identification of the assailant and his apprehension. Thus, the other-crimes evidence is properly presented for a purpose other than to show the defendant's propensity to commit crime. (See *People v. Phillips* (1989), 127 Ill. 2d 499, 520.) Yet, as *Hayes* makes clear, evidence of other crimes is not admissible merely to show how the investigation unfolded *unless* such evidence is also relevant to specifically connect the defendant with the crimes for which he is being tried. (*Hayes*, 139 Ill. 2d at 131. See *People v. Richardson* (1988), 123 Ill. 2d 322 (construing *People v. McKibbins* (1983), 96 Ill.

2d 176, 182).) The limitation applies to prevent the risk of prejudice to a defendant even in the face of the State's legitimate need to present evidence of the steps in its investigation.

We rely on a different portion of the decision in *Hayes* for disposition of defendant's claimed error. In *Hayes*, the defendant contended that he was prejudiced by the admission of evidence which suggested that he had engaged in prior criminal conduct. Specifically, a witness testified that he identified a photograph of the defendant in the photo books at the violent crimes police station. The defendant claimed that such testimony improperly informed the jury that he had a violent criminal background.

This court agreed that the evidence may have raised an inference in the jurors' minds that the defendant had a criminal history. Nevertheless, the court concluded that the evidence was not so prejudicial where there was no direct evidence of such conduct and, further, there was no suggestion that the persons whose photos were in the books had previous contact with police. *Hayes*, 139 Ill. 2d at 145-46; *cf. People v. Diaz* (1979), 78 Ill. App. 3d 277 (holding that detailed evidence of defendant's subsequent criminal activity was error).

Here, as in *Hayes*, the jury heard neither direct evidence nor argument at this phase of trial of defendant's other murder conviction. The disclosure was limited to the fact that defendant was in custody in a facility in California and was subsequently extradited here. Conceivably, the evidence could have been tailored to provide only that the FBI check revealed defendant's presence in California and that he was subsequently extradited here. Nevertheless, the evidence as presented had no tendency to "overpersuade the jury" on the issue of defendant's guilt. (See *People v. Lindgren* (1980), 79 Ill. 2d 129, 137.) Defendant was not unduly prejudiced by this evidence.

Defendant's second argument in support of his prejudicial-disclosures contention is that testimony concerning his prior eviction had no proper purpose. He maintains that this evidence was irrelevant and served primarily to portray him as a "deadbeat" and a bad person.

Evidence of defendant's eviction was elicited on three separate occasions at trial, twice by the State and once in the course of defense counsel's cross-examination of Keith. The only objection came at the evidence's first mention. Further, we notice that this claimed error is not included in defendant's post-trial motion. We therefore deem the issue waived. See *Barrios*, 114 Ill. 2d at 275; *Enoch*, 122 Ill. 2d at 187.

Defendant assigns additional error to the admission of evidence offered to prove flight. Defendant contends that the State knew that he had left Illinois to surrender to authorities in California on December 16, 1985. Nevertheless, the State misled the jury to believe that defendant fled and successfully eluded police for $2^1/2$ years. In a related argument, he asserts that the circumstantial-evidence instruction, which was premised on the State's theory of flight, was also error.

The State responds that this issue is waived for defendant's failure to object at trial and to include it in his post-trial motion.

The record reveals that during the instructions conference, the State tendered an instruction on circumstantial evidence. Defendant objected, arguing the inexistence of such evidence. The State responded that the instruction was properly premised on the State's intention to present circumstantial evidence of defendant's flight. Over defendant's objection, the instruction was given.

Initially, we notice that defendant's objection to the circumstantial-evidence instruction has been properly

included in his post-trial motion. (See *People v. Gosier* (1991), 145 Ill. 2d 127, 162.) Although defendant voiced no objection to Keith's testimony on the subject of flight at trial, given that flight served as the basis for the instruction, we deem defendant's objection to the instruction sufficient to preserve both claimed errors for review.

That said, we nevertheless find no instructional error. At trial, Keith testified that defendant told him that the decedent owed defendant money and that he would kill her. This testimony was circumstantial evidence of defendant's motive to kill. Thus, even absent competent evidence of flight, the instruction was appropriate in light of the State's motive evidence. Furthermore, any error in giving or refusing an instruction will not justify reversal when the evidence in support of the conviction is so clear and convincing that the jury's verdict would not have been different had the instruction not been given. (*People v. Austin* (1989), 133 Ill. 2d 118, 124; see also *People v. Farnsley* (1973), 53 Ill. 2d 537, 546.) Such is the case here.

We next consider the propriety of the State's presentation of flight evidence at defendant's trial. During opening and closing argument, the State informed the jury that after defendant had committed the murder, he fled. In support of that argument, the State presented testimony from Kevin Keith and investigating police officers who investigated the whereabouts of defendant after the murder.

The fact of flight, when considered in connection with all other evidence in a case, is a circumstance which may be considered by the jury as tending to prove guilt. (*People v. Herbert* (1935), 361 Ill. 64, 73.) The inference of guilt which may be drawn from flight depends upon the knowledge of the suspect that the offense has been committed and that he is or may be suspected.

(*People v. Harris* (1961), 23 Ill. 2d 270, 273.) Defendant asserts that any evidence of his knowledge is absent and, therefore, the evidence and argument were improper. We disagree.

While evidence that a defendant was aware that he was a suspect is essential to prove flight, actual knowledge of his possible arrest is not necessary to render such evidence admissible where there is evidence from which such fact may be inferred. (See *People v. Hayes* (1990), 139 Ill. 2d 89, 133; see also *People v. Griffin* (1974), 23 Ill. App. 3d 461, 463.) The evidence presented here could properly support an inference of knowledge.

The State's theory of flight was based on Keith's testimony that on the day after the murder defendant left home carrying a duffel bag. Although defendant had never spoken of moving out of the apartment, he never returned. He left behind his stereo equipment and some other clothing in the apartment. In further support of its theory, the State presented evidence of its extensive, but unsuccessful, search for defendant at his prior residences and such other places which defendant was known to frequent. From this evidence, the jury could validly infer that defendant knew that he was a suspect and that he consciously avoided police.

Decisional law on the subject supports our conclusion. See *People v. Pavelick* (1939), 372 Ill. 567 (evidence of flight held proper where defendant was located in California more than two years after commission of a burglary and evidence showed more than a mere absence from his home or usual place of abode); *People v. Langford* (1992), 234 Ill. App. 3d 855 (evidence that defendant was in custody in Tennessee at time of arrest properly admitted as evidence of flight); *People v. Wilson* (1980), 87 Ill. App. 3d 693 (holding that inference of flight properly drawn where victim testified that defendant was not in his apartment when she and police went

to look for him; police officer informed defendant's roommate that defendant was wanted in connection with rape; police unsuccessfully searched for defendant; and defendant not arrested until 17 days after rape); *People v. Torres* (1977), 53 Ill. App. 3d 171 (holding inference properly drawn where officers had inquired of friends, neighbors and relatives of defendant's whereabouts, even absent evidence that the officers' inquiries were related to defendant; and defendant failed to return to work or pick up paycheck and attempted to elude police by hiding in a refrigerator); but see *Hayes*, 139 Ill. 2d 89 (finding no facts from which inference could be drawn where evidence showed that detective went to home of defendant's parents, asked to speak with defendant, left his phone number and returned a number of times to locate defendant; but no evidence that defendant either received officer's card, was informed that police were looking for him, or that he even lived at parents' home prior to offense).

Defendant, nevertheless, asserts that his departure from Illinois was for the purpose of surrendering to California authorities. As the State knew that his departure was for that purpose, defendant urges it was improper to present evidence of flight.

The jury heard the evidence concerning defendant's December 1985 surrender. Having so heard, it was free to believe, or not, that defendant's departure from Illinois was for the purpose of surrendering in California. However, evidence of his departure, allegedly to surrender, did not defeat the admissibility of the same as evidence of flight. The fact of his surrender merely went to the weight of the State's flight evidence. We find no error in the "injection" of flight into this case.

Defendant's next alleged trial error concerns the trial court's refusal to instruct the jury on the circumstances of an identification.

Defendant tendered an identification instruction, the language of which mirrors our current pattern instruction on eyewitness identification. (See Illinois Pattern Jury Pattern Instructions, Criminal, No. 3.15 (3d ed. 1992) (hereinafter IPI Criminal 3d).) The State objected to the instruction, arguing that the Illinois Pattern Jury Instructions, Criminal, No. 3.15, second edition, recommended that no instruction be given on identification; that the subject was adequately covered by the general instruction on the believability of witnesses. See Illinois Pattern Jury Instructions, Criminal No. 3.15 (2d ed. 1981).

Defense counsel, in support of his tendered instruction, advised the court that the instruction was in the newest edition of the pattern instructions. After some proceedings off the record, the trial court announced its declination to give defendant's tendered instruction, and chose instead to give Illinois Pattern Instructions, Criminal, No. 1.02, second edition. Further, and consistent with the comments to the pattern instruction, the court advised defendant that he would permit him argument on the circumstances of the eyewitness identification during closing. See Illinois Pattern Jury Instructions, Criminal, No. 1.02 (2d ed. 1981).

As we have previously noted, instructional error is harmless and may not support a reversal when the evidence in support of conviction is so clear and convincing that the jury's verdict would not have been different even had the proper instruction been given. (*People v. Johnson* (1991), 146 Ill. 2d 109, 137.) To determine whether a claimed instructional error was so prejudicial to defendant as to constitute reversible error, the tendered instruction must be viewed in light of the facts of the case and the evidence presented. See *United States v. Garcia* (7th Cir. 1990), 897 F.2d 1413, 1422.

Defendant's tendered instruction, which included five identification factors, read as follows:

"When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following: (1) The opportunity the witness had to view the offender at the time of the offense; (2) The witness' degree of attention at the time of the offense; (3) The witness' earlier description of the offender; (4) The level of certainty shown by the witness when confronting the defendant; (5) The length of time between the offense and the identification."

Defendant argues that the court's refusal to give the above instruction was particularly unfair because: the State presented a single eyewitness, who described the offender as thin and age 30, whereas defendant was heavy set and only 19 years old; the police report listed the offender as "scars unknown," in "stark" contrast to the prominent scar on the side of defendant's face; the witness did not tell the police that she was even remotely familiar with the offender; the lineup was not close in time to the offense, but 2$^1$/$_2$ years later; and Keith, who had "numerous motives to make false accusations," was not an eyewitness upon whose testimony the case depended.

Initially, we note that the court's instruction was consistent with the pattern instructions as they existed at the time of defendant's trial. Nevertheless, we have considered defendant's tendered instruction, particularly the five identification factors, in light of the evidence presented.

In that regard, we first note that Brunell had more than adequate opportunity to view the offender. She not only observed him prior to the murder, but interacted with him during the course of the murder, and assisted in his departure from the apartment after the murder. Second, Brunell, who had given the offender access to the apartment, watched as he repeatedly assaulted her mother, and continued to watch as he "rolled her up" and took the key. Brunell then responded to the offender's summons for assistance in departing. Surely,

there can be no question concerning the level of her attention at the time of the offense. Third, Brunell's descriptions of defendant as the offender have been consistent. With the exception of the omission of a scar, and some discrepancy on the issue of body build, her description of defendant was positive. Significantly, Brunell was not attempting a description of a stranger, seen for the first time during the commission of an offense. This offender was known to Brunell. Fourth, Brunell was unwavering in her identification of defendant as the offender, both in the police lineup and in court. Fifth and finally, Brunell identified defendant to police immediately after the murder, by nickname, and two days later, in a photo array. There was no appreciable lapse in time between the commission of the offense and her identification. As is apparent, this evidence rendered unnecessary any guidance to the jury by those factors included in defendant's tendered instruction.

We note further that the committee notes to the current identification instruction, which includes these same five identification factors, provides that only the particular ones of those factors that are supported by the evidence should be given. (IPI Criminal 3d No. 3.15, Committee Note.) As we have here demonstrated, the evidence does not support the giving of any one of those factors.

Defendant further asserts that our Rule 451(a) (134 Ill. 2d R. 451(a)) requires that a pattern instruction on defendant's theory of the case should be given if the instruction adequately states the law.

Our Rule 451(a) provides that whenever Illinois Pattern Instructions contain an instruction applicable in a criminal case, *giving due consideration to the facts and the governing law, and the court determines that the jury should be instructed on the subject,* the pattern

instruction shall be used. (134 Ill. 2d R. 451(a).) Contrary to defendant's assertion, the rule does not mandate the giving of any instruction merely because one exists on defendant's theory of the case. As the rule expressly states, whether to give an instruction remains a matter for the court's determination. Where the court determines, in the first instance, that an instruction is warranted, the rule merely requires the use of the pattern instruction, if such instruction is legally correct. See 134 Ill. 2d R. 451(a); *People v. Wilkerson* (1981), 87 Ill. 2d 151, 158-59.

The "complexities and pitfalls" which might ordinarily attend an identification were simply not present in this case. (See IPI Criminal 3d No. 3.15, Committee Note.) Thus there was no need to instruct on the five identification factors. Even assuming that defendant's tendered instruction was the proper one to have been given, however, a different verdict would not have resulted. We conclude no error in the court's identification instruction.

Defendant's final claimed guilt phase error is that the evidence does not prove his identity sufficient to support the convictions. Defendant asserts that, not only does he not fit the police description of him, but the identification procedures were not sufficiently reliable to overcome weaknesses in the identification evidence.

Specifically, defendant points out that Brunell's description to the police was by means of making comparisons between officers present during the investigation and her recollection of the assailant's appearance. Her physical description of the assailant was as follows: "male, black, 29-30 years old, slender build, walks with a slight limp." Yet, defendant was 19 and of heavy build. Further, defendant points out, none of the police reports mentioned facial scarring, and one report listed "scar unknown." Yet defendant had a prominent facial scar.

Finally, in support of this argument, defendant asserts that Keith had numerous motives to make false accusations.

Prior to addressing the alleged insufficiency of Brunell's identification, we note that Keith was not an eyewitness to the commission of the murder. Keith's testimony was presented solely as circumstantial evidence of motive and flight. Thus, Keith's credibility is not relevant on the issue of eyewitness identification.

The State bears the burden of proving beyond a reasonable doubt the identity of the person who committed the charged offense. (Ill. Rev. Stat. 1985, ch. 38, par. 3—1.) Certainly, an identification which is vague or doubtful is insufficient to support a conviction. (*People v. Ash* (1984), 102 Ill. 2d 485, 494.) However, a single witness' identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification. *People v. Slim* (1989), 127 Ill. 2d 302, 307; *People v. Jones* (1975), 60 Ill. 2d 300, 307-08.

In assessing identification testimony, our courts have generally relied upon certain factors set out by the Supreme Court in *Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375. Those circumstances, which, incidentally, have now been embodied in our pattern jury instruction on identification, include: (1) the opportunity the victim had to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the victim at the identification confrontation; and (5) the length of time between the crime and the identification confrontation. See *Slim*, 127 Ill. 2d at 307-08; see also IPI Criminal 3d No. 3.15.

As we have previously recited the circumstances of Brunell's identification of defendant as the assailant, we

need not repeat them here. Further, we have already considered these factors in our analysis of defendant's claimed instructional error. Suffice it to say that none of the above factors weigh in defendant's favor. Additionally, we note, discrepancies and omissions as to facial and other physical characteristics are not fatal, but merely affect the weight to be given the identification testimony. (*Slim*, 127 Ill. 2d 302.) Such discrepancies and omissions do not in and of themselves generate a reasonable doubt as long as a positive identification has been made. *Slim*, 127 Ill. 2d at 309.

The discrepancies and omissions about which defendant here complains parallel factual situations previously considered and held not to have affected the validity of a conviction. (See *Slim*, 127 Ill. 2d 309-13 (and cases cited).) We do not find the identification evidence here so unsatisfactory as to justify a reasonable doubt as to defendant's guilt. See *Collins*, 106 Ill. 2d at 261.

After careful consideration of the issues raised, we find no reversible error at the guilt phase of these proceedings.

## SENTENCING PHASE

Defendant claims a total of 14 separate errors at the eligibility and aggravation phases of sentencing. In light of our disposition of the "reverse-*Witherspoon*" issue, however, defendant will receive a new sentencing hearing. Thus, we need not address these additional claimed errors. See *Cloutier*, 156 Ill. 2d at 510; *Smith*, 152 Ill. 2d at 273-74; *cf. Johnson*, 159 Ill. 2d at 135.

## CONSTITUTIONALITY OF ILLINOIS DEATH PENALTY STATUTE

As a final matter, defendant asserts that various aspects of our death penalty statute are unconstitutional. He acknowledges that these challenges have been considered and rejected by this court in prior cases. Nevertheless, he urges our reconsideration.

As defendant has asserted no basis in support of our reconsideration of these challenges, we decline to do so. We continue to hold that: the manner in which prosecutors exercise discretion to seek the death penalty does not create unconstitutional arbitrariness (see *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 535-43); the statute does not impermissibly shift the burden of proof to the defendant (see *People v. Tenner* (1993), 157 Ill. 2d 341, 390); the statute does not impermissibly bar the sentencing authority from considering "sympathy" for the defendant (see *People v. Terrell* (1989), 132 Ill. 2d 178, 226); the statute is not constitutionally infirm because the State is not required to prove the absence of mitigation beyond a reasonable doubt (see *People v. Johnson* (1987), 119 Ill. 2d 119, 151); the standards for determining whether the death penalty should be imposed are not unconstitutionally vague (see *People v. King* (1986), 109 Ill. 2d 514, 547); the factors in the statute do not render its application arbitrary and capricious (see *People v. Johnson* (1991), 146 Ill. 2d 109, 154); and, finally, comparative proportionality review is not constitutionally required (see *People v. Ashford* (1988), 121 Ill. 2d 55, 82-83).

## CONCLUSION

We affirm defendant's convictions and sentence for armed robbery. The trial court's refusal to "reverse-*Witherspoon*" or "life-qualify" the jury, however, amounted to a violation of defendant's due process rights. Accordingly, defendant's death sentence is vacated and the cause is remanded for a new death sentencing hearing consistent with this opinion.

*Convictions affirmed;*
*nondeath sentence affirmed;*
*death sentence vacated;*
*cause remanded.*

JUSTICE HARRISON, dissenting:
The majority holds that any error in denying defen-

dant a continuance to obtain an independent expert opinion on the psychiatric records of State's witness Kevin Keith was harmless beyond a reasonable doubt, and that the erroneous admission of evidence of the victim's pregnancy "did not substantially compromise defendant's right to a fair and impartial trial." (165 Ill. 2d at 333.) I believe that these errors require the reversal of defendant's murder conviction and entitle him to a new trial. I therefore dissent.

Defendant alleges that his continuance request should have been granted after newly discovered medical records of State's witness Keith were disclosed the day of trial. In *People v. Lott* (1977), 66 Ill. 2d 290, this court stated: "There is no mechanical test, statutory or other, for determining the point at which the denial of a continuance in order to accelerate the judicial proceedings violates the substantive right of the accused to properly defend." (*Lott*, 66 Ill. 2d at 297.) However, this court has long recognized that a refusal to grant a continuance which results in depriving the accused of a reasonable time to prepare his defense constitutes reversible error. (*Lott*, 66 Ill. 2d at 296-97, citing *People v. Blumenfeld* (1928), 330 Ill. 474.) While resolution of whether there has been an abuse of discretion in denying a motion for continuance based upon defense counsel's lack of preparation is dependent upon the particular facts and circumstances of each case, it has been held that such a determination is to be considered in light of the diligence shown on the part of the defendant as well as the extent such a denial hindered the defendant in preparing his defense and prejudiced his rights. See *People v. Jefferson* (1976), 35 Ill. App. 3d 424, 426.

Applying these legal tenets to the case at bar, the record clearly establishes that the trial court did not exercise sound discretion in refusing to grant a continu-

ance. Defense counsel's conduct in requesting a continuance on the day he became aware of the State's new discovery material, the day before trial was set to begin, unequivocally exemplified his due diligence. Moreover, because defense counsel did not receive Keith's medical reports until the day of trial, it is evident that the trial court's refusal to grant a continuance precluded a comprehensive analysis by defense counsel of the contents of such reports, which hindered defendant in the defense of his case. Defendant was forced to trial despite his counsel's repeated statements that he was unable to proceed without assistance in interpreting the records. I fail to see how defense counsel could have been expected to find an expert, interview prospective witnesses and prepare to cross-examine Keith on the information contained in the records, and at the same time effectively participate in the *voir dire* examination of the jurors, present his opening statement and perform the numerous other functions necessary to insure adequate representation by counsel. See *Jefferson*, 35 Ill. App. 3d at 426-27.

The majority states that in a capital murder case, "every reasonable opportunity should be given the defendant to investigate witnesses against him and to prepare his defense." (165 Ill. 2d at 326.) However, the majority then proceeds to sidestep the question of whether defendant was denied this substantial right in favor of a harmless error analysis. Even if the evidence presented at trial herein were overwhelming, which it is not, "[t]he rule that a judgment will not be reversed where the evidence clearly establishes the defendant's guilt does not justify the total disregard of the rights of a prisoner on trial for an alleged crime." *People v. Stanko* (1949), 402 Ill. 558, 562.

In *People v. Cobb* (1983), 97 Ill. 2d 465, this court held that the trial court, in an armed robbery and mur-

der case in which the death penalty was sought, abused its discretion in refusing to allow the defense a continuance in order to lay a foundation to impeach the principal prosecution witness. The evidence the defense sought a continuance to obtain would have directly contradicted the testimony given by the State's witness at trial. The *Cobb* court noted that without this key witness' testimony, the prosecution would be left with "only some circumstantial evidence and the vague equivocal testimony of the [other identification witness]." (*Cobb*, 97 Ill. 2d at 478.) The court therefore found reversible error in the trial court's refusal to allow the defense "a reasonable opportunity" to locate the necessary witness. *Cobb*, 97 Ill. 2d at 478-79, 481.

Here, as in *Cobb*, defendant was prejudiced by the trial court's erroneous refusal to grant a continuance. The majority agrees that Keith was a key State's witness whose accusations led to defendant's arrest, and who provided uniquely damaging evidence of his flight, threat against the victim, and motive to commit murder. The records on Keith which defense counsel requested a continuance to investigate included multiple diagnoses of manic-depression, a bi-polar affect disorder, hyperactivity, cocaine abuse, and "elevated mood paranoia." Evidence of mental illness bears not just upon the witness' general truthfulness, but also upon the reliability of specific testimony. (See *People v. Phipps* (1981), 98 Ill. App. 3d 413, 416.) Given the potentially deleterious effect of these conditions on Keith's "powers of discernment, memory, and description" (*Phipps*, 98 Ill. App. 3d at 416), the trial court should have granted a continuance for counsel to interview witnesses necessitated by the untimely disclosures and to prepare to cross-examine Keith on the vital issue of his credibility. Therefore, under *Cobb*, where the impeaching testimony would have seriously damaged the State's case against

defendant, the denial of a continuance was reversible error.

The majority further holds that the erroneous admission of evidence of the victim's pregnancy at the time of her death, "though irrelevant and prejudicial, did not substantially compromise defendant's right to a fair and impartial trial." (165 Ill. 2d at 333.) I vehemently disagree. The majority correctly states the applicable rule, announced in *People v. Bernette* (1964), 30 Ill. 2d 359, and more recently in *People v. Hope* (1986), 116 Ill. 2d 265, that where testimony in a capital case respecting the decedent's family is not elicited incidentally, but is presented in such a manner as to cause the jury to believe it is material, its admission is highly prejudicial and constitutes reversible error unless an objection thereto is sustained and the jury instructed to disregard such evidence. (*Hope*, 116 Ill. 2d at 277-78; *Bernette*, 30 Ill. 2d at 371.) Here, the majority agrees that the evidence concerning decedent's unborn child was not brought to the jury's attention incidentally. Rather, it was elicited through questions to the pathologist and presented so as to permit the jury to believe it material. The majority further admits that the trial court's overruling of defendant's objection to this testimony, "tended to amplify its materiality," in the mind of the jury. (165 Ill. 2d at 333.) Despite this apparent finding that the criteria set forth in *Bernette* and *Hope* have been met in the instant case, the majority nevertheless concludes that "measured against the conduct in *Bernette* and *Hope*," the manner in which the evidence here was presented did not "unduly focus[ ] the jury's attention on the materiality of this evidence." (165 Ill. 2d at 333.) This holding is contrary to both the spirit and intent of the established precedent.

"A defendant's guilt must be established by legal and competent evidence, uninfluenced by bias or preju-

dice raised by irrelevant evidence \*\*\*." (*Bernette*, 30 Ill. 2d at 371.) It is for this reason that this court has consistently condemned the admission of irrelevant evidence concerning a decedent's personal traits or familial relationships. (See 165 Ill. 2d at 330.) In the case at bar, the effect of the disclosure of Yvonne Donald's pregnancy served only to arouse the jurors' sympathy for a victim attacked in this condition, and their vengeance and outrage against defendant for the additional loss of the life of the unborn child.

Although the testimony here was not presented by a member of the victim's family as in *Bernette* and *Hope*, its presentation as part of the pathologist's autopsy findings not only gave the jury the erroneous impression that such information was relevant, but also provided the jury with more descriptive details than could a family member. Thus, unlike the majority, I find no quantitative distinction between a widow's emotional testimony about a decedent's family and the physician's vivid description of the five-month-old female fetus being carried by decedent herein. Both types of testimony were highly prejudicial and were elicited by the prosecution to deprive the defendants of a fair trial by precluding an unimpassioned determination of their guilt or innocence. As this court stated in *Hope*, "[t]he only purpose these questions could serve is to prejudice the defendant in the eyes of the jury, 'and to arouse in them anger, hate and passion.'" *Hope*, 116 Ill. 2d at 278, quoting *People v. Dukes* (1957), 12 Ill. 2d 334, 340.

Further, I object to the majority's suggestion that such impermissible evidence may be freely elicited by the prosecution during direct examination if the error is "not further exacerbated" by its mention during opening or closing argument. (165 Ill. 2d at 333.) This court, in *Bernette*, stated two separate and distinct rules: (1) that reversible error occurs when the prosecution elicits

irrelevant and prejudicial testimony concerning the decedent's family so as to cause the jury to believe it material, and (2) that jury argument dwelling on the decedent's family or seeking to relate a defendant's punishment to the existence of family is inflammatory and improper. (*Bernette*, 30 Ill. 2d at 371.) Ignoring a breach of the first rule because it was not compounded by a breach of the second runs the risk of deteriorating this important procedural safeguard. Such an obvious attempt to unfairly influence the jury as occurred herein cannot be condoned and should have constituted reversible error.

For the foregoing reasons, I respectfully dissent.