Docket No. 83670–Agenda 3–September 1999.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. HECTOR NIEVES, Appellant.

Opinion filed January 21, 2000.

JUSTICE HEIPLE delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant Hector Nieves was convicted of first degree murder. The same jury found defendant eligible for the death penalty based on his having been convicted of two murders. After the jury found that no mitigating circumstances existed sufficient to preclude imposition of the death penalty, the court entered judgment on the jury’s finding and sentenced defendant to death. Defendant’s sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 609(a). In this appeal, defendant raises 12 issues challenging his conviction and death sentence. We affirm defendant’s conviction but vacate defendant’s sentence of death and remand for a new sentencing hearing.

BACKGROUND

The following evidence was adduced at trial. Late in the evening of September 13, 1992, police found the body of the victim, Louis Vargas, behind a building at 2808 West North Avenue in Chicago. Vargas’ face and head had been badly beaten with what police believed to be a blunt object. His body was found between the rear wall of the building and a large truck, lying face down in a pool of blood on top of several cardboard boxes. Police determined that Vargas had died fairly recently, as his head was still bleeding when they arrived on the scene. Vargas’ shoes were missing and one of his pants’ pockets was turned inside out and bloody. No identifiable fingerprints or any other physical evidence was found at the murder scene. Police searched the vicinity of the crime scene, including nearby dumpsters and garbage cans, but did not find a murder weapon.

The day after Vargas’ body was found, police conducted interviews with several people in the area regarding the murder. Although no witnesses to Vargas’ beating were located, Anthony Laboy told police that he had seen Vargas in Humboldt Park the previous day. Laboy was sitting on a bench drinking a beer around 6:30 p.m. when he saw Vargas and another man, known only to Laboy as “Papo,” about 25 feet away. According to Laboy, the two were arguing over money to buy liquor.

Laboy further told police that, in the course of the argument, Papo took out a long cylindrical object that looked liked a screwdriver or an ice pick. Papo turned toward Vargas, who took the object away and threw it to the ground. Vargas then grabbed Papo’s walking cane and threw it to the ground. Next, Vargas “slammed” Papo to the ground. After this incident, Vargas and Papo walked away with several other men. According to Laboy, the argument had ended and everything looked to be “straightened out.” Laboy did not see Vargas or Papo the rest of the night.

Based on Laboy’s information, police searched Humboldt park for Papo, later identified as the defendant, Hector Nieves, to question him in connection with Vargas’ murder. Police were unable to locate the defendant, however, and the murder went unsolved for more than a year and a half.

On May 20, 1994, New York City officials contacted the Chicago State’s Attorney’s office regarding a man who had turned himself in to New York police in connection with a murder in Central Park, and who also wished to make a statement regarding a murder in Chicago. Cook County Assistant State’s Attorney John Muldoon, Chicago police detective Lou Rabbit, and a court stenographer traveled that same day to New York City to meet with the man, who identified himself as Hector Nieves, the defendant. After Muldoon and Rabbit advised defendant of his rights, defendant spoke privately with them for about 20 minutes. At the conclusion of this conversation, defendant agreed to give a court-reported statement.

After again being advised of his rights, including the right to remain silent and the right to counsel, defendant stated that he was with Vargas in Humboldt Park during the afternoon of September 13, 1992. The two began arguing when defendant refused to give Vargas a dollar to buy wine. Vargas got very upset and threw defendant’s walking cane, which defendant needed due to a recent leg surgery. Defendant stated that he got angry at Vargas for taking his cane and decided to retaliate. He formed a plan to wait for Vargas to go to sleep and then kill him.

Defendant further stated that, later that night, he went to Vargas’ usual sleeping place behind a restaurant at the intersection of North Avenue and California Street. Defendant knew that there was always a truck parked in the rear alley and that Vargas always slept underneath this truck. After finding a pipe in the alley, defendant climbed into the back of the truck, which was unlocked, and waited for Vargas. Vargas arrived sometime around 9:30 or 10 p.m. Defendant waited approximately 15 minutes to be sure that Vargas was sound asleep, and then climbed out of the truck. He struck Vargas on the head with the pipe between 10 and 15 times, killing him. Defendant stated that he then left the scene, throwing the pipe into a back yard about three houses away.

The case proceeded to trial in June 1997. In addition to Alexander Laboy and John Muldoon, several Chicago police personnel who worked on the case testified for the prosecution. Dr. Edmond Donoghue, chief medical examiner for Cook County, testified as to the cause of Vargas’ death. Dr. Robert Kirschner, who had performed the autopsy on Vargas’ body, had since retired and was out of the country. Dr. Donoghue, however, reviewed Dr. Kirschner’s file and testified as an expert in forensic pathology. Dr. Donoghue concluded that Vargas died from severe injuries to the skull and brain consistent with being beaten about the head with a pipe. According to Dr. Donoghue, Vargas had been struck at least eight times in a beating that “would have killed anyone.”

No witnesses testified on behalf of the defense, which rested at the close of the prosecution’s case in chief. The jury then found defendant guilty of first degree murder.

At the death penalty eligibility hearing, New York City police detective Eugene Heghmann and New York Assistant District Attorney Cynthia Sippnick both testified regarding defendant’s involvement in the June 1993 killing of Santos Bermudez. Sippnick further testified that defendant subsequently pleaded guilty in New York to first degree manslaughter in connection with Bermudez’s killing and a certificate of conviction was entered into evidence.

At the close of Sippnick’s testimony, the trial court ruled, outside the presence of the jury, that the New York first degree manslaughter statute was substantially similar to the Illinois first degree murder statute. The jury then returned a verdict unanimously finding defendant eligible for the death penalty under the aggravating factor of having been convicted of murdering two or more individuals. 720 ILCS 5/9–1(b)(3) (West 1996).

At the aggravation-mitigation phase of the death penalty hearing, the prosecution introduced evidence of defendant’s lengthy criminal history and numerous prison disciplinary infractions since his first incarceration after convictions for burglary and armed robbery in the late 1970s. The jury also heard evidence linking defendant to two additional murders, that of Lonnie Jackson in 1991 and of Rafeal Cuevas in 1992, to which defendant had confessed in separate court-reported statements made at the same time as his statement regarding the Vargas murder.

In mitigation, defendant presented testimonial evidence of his good behavior while held at the Cook County jail. Defendant’s brother also offered testimony of defendant’s abusive childhood. In addition, two licensed clinical psychologists testified as to defendant’s low intelligence and severe personality disturbance.

After hearing all the factors in aggravation and mitigation, the jury unanimously found that there were no mitigating circumstances sufficient to preclude the imposition of the death penalty. The trial court then sentenced defendant to death.

ANALYSIS

Defendant raises 12 issues on appeal, challenging both his conviction and death sentence. We address each in turn.

Trial Errors

Voir Dire

Defendant first contends that his right to due process and a fair trial was abridged when he was not afforded the opportunity to question potential jurors after their responses to the trial court’s 
voir dire
 questions resulted in their excusal for cause. During 
voir dire
, the trial court first individually questioned each potential juror, without input from the State’s Attorneys or defense counsel. On the basis of their responses, the trial court either excused the potential jurors for cause or passed them along for further questioning by both parties.

After the first stage of this process, three potential jurors, George Mikicich, Eleanor Taylor and Jewel Heingeininger, were excused for cause after their responses to the court’s questions revealed that their beliefs would prevent them from imposing the death penalty. Two other potential jurors, Cecilia Isom and George Lyons, passed the first stage of questioning by the trial court, although they expressed concerns about the death penalty but stated that they would consider it. Upon further questioning by the prosecution, however, both Isom and Lyons were excused for cause after both stated that they would not be able to impose the death penalty.

Initially, we note that defendant objected only to the excusal of Mikicich, Isom and Lyons. Defendant did not object to the excusal of Taylor or Heingeininger, nor did he seek to question those potential jurors who were excused for cause after the court had concluded its examination of them. In this appeal, however, defendant does not argue that these potential jurors were improperly excused. Rather, he argues for the first time that the 
voir dire
 was unfair and prejudicial because the trial court allowed the prosecution to examine potential jurors who expressed scruples against the death penalty after their initial examination, but summarily excused for cause without further questioning by defense counsel those potential jurors who stated that they could not impose the death penalty. According to defendant, the prosecution was given greater latitude to question potential venire members, and received a benefit when Isom and Lyons were excused without the prosecution having to use any of its peremptory challenges. Thus, the number of venire members that the prosecution was able to excuse was increased, some of whom may have been sympathetic to defendant. Defendant claims that he should have been given the same opportunity to question venire members Mikicich, Taylor and Heingeininger to clarify their stance regarding the death penalty.

The State asserts that defendant has waived review of this issue because defense counsel failed to object on this particular ground before the trial court and failed to raise this issue in his post-trial motion. We agree. To preserve an issue for review, a defendant must both object at trial and specifically include the objection in a post-trial motion. 
People v. Enoch
, 122 Ill. 2d 176, 186 (1988). Here, defendant has never before raised the issue of being denied an opportunity to conduct additional 
voir dire
 of potential jurors Mikicich, Taylor and Heingeininger. Thus, this issue is waived.

Defendant next claims that the trial court abused its discretion when it refused to grant his motion for a mistrial after the prosecution asked a potential juror who worked at the Cook County jail whether he had worked with defendant. During 
voir dire
, potential jurors were called to the jury box in groups of 12 to be questioned. One such potential juror, James Graham, stated that he was a minister and had worked for 35 years as a volunteer at the Cook County jail. After the trial court’s initial 
voir dire
, the prosecution continued to question Graham about his work at the jail, during which the following exchange took place:

“Prosecution: In the course of your work with inmates at Cook County Jail, have you ever had occasion to work with any of the individuals on death row?

Graham: Yes, I have.

***

Prosecution: Have you ever had occasion to work with Mr. Nieves who is before your Honor, before the court today?

Defense: Objection.

Graham: No.”

At this point, a conference was held outside the presence of the jury where defense counsel moved for a mistrial on the basis that the prosecutor’s question implied that defendant was or had been incarcerated at the Cook County jail. Defendant’s motion was denied.

Defendant contends that the potential jurors who were present during the prosecutor’s questioning of Graham were left with the clear implication that he was involved in other criminal conduct or may already be on death row. Despite that Graham responded in the negative, defendant claims that the prosecutor’s question was deliberately posed to link defendant with the Cook County jail, thus prejudicing him to such a degree that a new trial is warranted. Defendant points out that the trial court had already asked all potential jurors whether they knew defendant, to which Graham responded in the negative. Thus, according to defendant, there was no reason to further ask Graham if he had worked with defendant.

The State responds that its questioning of Graham was proper in its entirety and was intended only to uncover whether Graham knew defendant. At worst, the State argues, the question may have alerted other potential jurors to the fact that defendant was in custody, but defendant’s conclusion that the question would lead other potential jurors to believe defendant had committed other crimes is unsupported. Further, the State points out, defendant has failed to establish how the jury which eventually heard this case was influenced or prejudiced by the prosecution’s questioning of Graham during 
voir dire
.

The decision whether to grant a mistrial is left to the discretion of the trial court. 
People v. Hall
, 114 Ill. 2d 376 (1986). There is no evidence to suggest that the prosecution’s questioning was designed to do anything more than determine whether Graham was acquainted with defendant. Given that defendant was awaiting trial for murder, it was not unreasonable for the prosecutor to ask Graham if he had encountered defendant through his work with inmates at the Cook County jail. This question, however, does not necessarily imply that defendant had committed other crimes or was already on death row. It is more likely that potential jurors hearing the prosecutor’s question would make the quite logical inference that the prosecutor was referring to defendant’s time in custody pending trial for the murder of Louis Vargas. The jury pool was not so tainted, however, as to warrant a mistrial based upon this question. Thus, the trial court did not abuse its discretion when it denied defendant’s motion for mistrial.

Furthermore, even assuming an error in the selection of jurors, reversal is not required unless the defendant has in some way been prejudiced. See 
People v. Lewis
, 165 Ill. 2d 305, 344 (1995). In 
Lewis
, this court held that the trial court’s statement to potential jurors that witnesses from Folsom Prison and the Alameda and Oakland police departments would be testifying did not so prejudice the defendant as to require reversal. 
Lewis
, 165 Ill. 2d at 347. In so holding, we rejected the defendant’s claim that the entire venire would have wondered, if not assumed, that the defendant was a convicted felon, stating that compelling eyewitness evidence against the defendant made it unlikely that his conviction was the result of the jury having heard the limited witness information. 
Lewis
, 165 Ill. 2d at 345.

We believe that the questioning of James Graham was proper. Moreover, we do not believe that defendant suffered any prejudice as a result.

Inadmissible Expert Testimony

Next, defendant argues that the testimony presented by Dr. Edmond Donoghue, chief medical examiner for Cook County, was not competent to establish Louis Vargas’ cause of death because it was based upon an autopsy performed by Dr. Robert Kirschner, who had retired and was out of the country at the time of trial. Defendant claims that, because Dr. Donoghue was not present during the autopsy and relied solely upon the medical examiner’s report in forming his opinion as to the cause of Vargas’ death, his testimony consists of inadmissible hearsay.

The State argues that defendant has failed to preserve this issue for review because he did not object to the admission of Dr. Donoghue’s testimony at trial. We agree. Defendant did not object at trial and did not include this issue in his post-trial motion. To the contrary, after Dr. Donoghue testified as to his background and qualifications, defense counsel readily agreed that Dr. Donoghue was qualified to render an opinion, stating, “No questions, Judge, he’s an expert.” Defendant has therefore waived this issue.

Defendant, however, argues that defense counsel’s failure to object to Dr. Donoghue’s testimony constituted ineffective assistance of counsel. According to defendant, there was no tactical reason for defense counsel’s failure to object and, had defense counsel done so, defendant would not have been convicted because all evidence concerning the cause of Vargas’ death would have been excluded.

To demonstrate ineffective assistance of counsel, a defendant must show (1) that his attorney’s performance fell below an objective standard of reasonableness and (2) that the attorney’s deficient performance resulted in prejudice to the defendant. 
People v. Williams
, 181 Ill. 2d 297, 320 (1998), citing 
Strickland v. Washington
, 466 U.S. 668, 687,  80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). We decline to find ineffective assistance of counsel here where any objection to the prosecutor’s remarks would rightfully have been overruled. The testimonial evidence offered by Dr. Donoghue was admissible pursuant to this court’s decision in 
Wilson v. Clark
, 84 Ill. 2d 186 (1981). In 
Wilson
, we held that an expert may give his opinion based upon facts that are not in evidence if those facts are of a type reasonably relied upon by experts in the particular field. 
Wilson
, 84 Ill. 2d at 193 (adopting Federal Rule of Evidence 703). In the instant case, Dr. Donoghue reviewed and formed his opinion based upon the contents of Dr. Kirschner’s medical file on Louis Vargas, which included autopsy photographs, a postmortem examination report, a toxicologic analysis report, an evidence receipt, diagrams made by Dr. Kirschner while he conducted the autopsy, an investigator’s report, and other administrative documents. We believe the reports found in Dr. Kirschner’s file, which Dr. Donoghue used in forming his opinion, are the type of evidence reasonably relied upon by experts in the field of forensic pathology to form their opinions as to the cause and manner of death.

This court has also held that experts may not only consider such information in forming their opinions, but may also testify as to nontestifying experts’ findings and conclusions. 
People v. Pasch
, 152 Ill. 2d 133, 176 (1992). While the contents of reports relied upon by experts would clearly be inadmissible as hearsay if offered for the truth of the matter asserted, an expert may disclose the underlying facts and conclusions for the limited purpose of explaining the basis for his opinion. 
Pasch
, 152 Ill. 2d at 176. In the instant case, Dr. Donoghue used Dr. Kirschner’s reports and records as the basis for forming his opinion as to the cause of Louis Vargas’ death. Such testimony was clearly admissible. Thus, defense counsel’s failure to object did not fall below an objective standard of reasonableness. Further, defendant failed to prove that he suffered any prejudice as a result.

Other-Crimes Evidence

Defendant next argues that the trial court abused its discretion by improperly allowing evidence of other crimes he had allegedly committed. First, defendant claims that such evidence was improperly introduced when Assistant State’s Attorney John Muldoon read the following portion of defendant’s court-reported statement:

“Muldoon: Now again Hector you turned yourself into the New York Police Department today, is that correct?

Defendant: Yes.

Muldoon: And you told them about this incident and some other incidents, is that correct?

Defendant: Yes.

Muldoon: Both in Chicago and in New York and–”

Defense counsel then objected. A sidebar was held in which defense counsel asked that the reference to “other incidents” be redacted from the copy of the statement that went back do the jury during deliberations. The trial court granted the request.

In general, evidence of other crimes is not admissible if it is relevant merely to establish defendant’s propensity to commit crime. 
People v. Kliner
, 185 Ill. 2d 81, 146 (1998). Evidence which suggests or implies that the defendant has engaged in prior criminal activity should not be admitted unless relevant. 
People v. Lewis
, 165 Ill. 2d 305, 346 (1995). Defendant argues that the reference to “other incidents” in his statement constituted evidence of other crimes which had no probative value and was introduced only to show defendant’s propensity to commit crime.

The State responds that the minor reference to other incidents was not introduced to show defendant’s propensity to commit crimes, but rather was relevant to explain the manner in which defendant came to be in the custody of the Chicago police. Furthermore, the State argues, even if the reference to “other incidents” should have been redacted from defendant’s statement before being read to the jury, in light of the overwhelming evidence of defendant’s guilt, the reference was not so prejudicial that it influenced the jury or denied him a fair trial.

Contrary to the State’s assertion, we do not believe that the reference to defendant’s “other incidents” in New York could have been properly introduced to show how the investigation of Vargas’ murder unfolded. When other-crimes evidence is presented as part of the steps in the investigation of a crime and the events leading up to it, the evidence must also be relevant to specifically connect defendant with the crimes for which he is being tried. 
Lewis
, 165 Ill. 2d at 346. We fail to see how any evidence of defendant’s criminal activity in New York is relevant to prove he committed the murder of Louis Vargas in Illinois. See 
People v. Richardson
, 123 Ill. 2d 322, 342 (1988) (other-crimes evidence not admissible in a criminal case unless it is relevant to prove that the defendant committed the crime at issue). While defendant’s presence in New York is relevant to explain the delay between the time of Vargas’ murder and defendant’s arrest, any evidence of other crimes committed by defendant while in New York is not relevant to, nor does it help prove, defendant’s guilt in the present case.

This court, however, has repeatedly held that the improper introduction of other-crimes evidence is harmless error when a defendant is neither prejudiced nor denied a fair trial based upon its admission. See 
Kliner
, 185 Ill. 2d at 147;
 People v. Cortes
, 181 Ill. 2d 249, 285 (1998);
 Lewis
, 165 Ill. 2d at 347; 
People v. Hayes
, 139 Ill. 2d 89, 145-46 (1990). No other references were made to defendant’s New York criminal activity during the guilt phase of defendant’s trial and the reference to “other incidents” was redacted from defendant’s statement before it was given to the jury. Thus, we agree with the State that any prejudicial effect that may have been produced by this one isolated and cryptic reference to defendant’s criminal activity in New York was overshadowed by the substantial evidence of defendant’s guilt–most notably, his own uncontested statement. Therefore, while we believe the reference to “other incidents” was improper, we conclude that this error was harmless beyond a reasonable doubt. Thus, defendant was not denied a fair trial, and the trial court did not abuse its discretion.

Defendant next challenges the admission of Chicago police officer Frank DeMarco’s testimony that one of Vargas’ pants’ pockets was turned inside out when his body was found. Defendant claims that the trial court again abused its discretion by allowing improper and highly prejudicial testimony of other crimes because DeMarco’s statement implied that defendant robbed Vargas, a crime for which he was not charged.

The State asserts that the testimonial evidence regarding Vargas’ inside-out pants’ pocket was relevant to reveal the nature of the crime, citing 
People v. King
, 29 Ill. 2d 150, 153-54 (1963). We agree. In 
King
, the defendant was convicted of murder. On appeal, he argued that the trial court erred by admitting into evidence testimony concerning three knife wounds on the neck of the victim, claiming that the evidence raised an inference that the wounds were caused by the defendant, who had been charged only with her shooting. This court held that no error was committed by the trial court in admitting the testimony, stating:

“All evidence concerning ‘the physical facts and circumstances showing a killing are admissible in evidence as tending to throw light on the transaction and to reveal the nature’ of the crime. [Citation.] Also all facts of the crime which show the aggravated nature of the offense are relevant to the punishment to be set by the jury.” 
King
, 29 Ill. 2d at 154.

The testimony surrounding the condition of Vargas’ clothes when his body was found is clearly evidence of the physical facts and circumstances surrounding his murder. Defendant’s characterization of the testimony regarding Vargas’ inside-out pants’ pocket as improper other-crimes evidence is inaccurate; it is not evidence of another crime, but part of the very same crime at issue before the court. The fact that defendant was not charged with robbery is irrelevant, just as it was irrelevant that the defendant in 
King
 was not charged with stabbing the victim. In both cases, the evidence was properly admitted to shed light on the crimes committed. Therefore, we conclude that the trial court did not abuse its discretion by overruling defendant’s objection to this evidence.

Improper Closing Argument

Next, defendant claims that the following remarks made by the prosecution during its rebuttal closing argument denied him a fair trial:

“Prosecutor: Ladies and gentlemen, there is no stranger, there is no robber there that no one knows about, there was only one person in the entire universe who had a motive based on the evidence to kill [Louis Vargas].

Defense counsel: Objection, that is not a reasonable inference.

Trial Court: Proceed. The jury has heard the evidence.”

Defendant argues that the prosecution did not present any evidence from which it could be inferred that Vargas’ character was such that he had no enemies and that no one else in the entire world would have wanted to kill him. According to defendant, the prosecution’s remarks were based upon the unreasonable inference that, merely because the State only presented evidence concerning defendant’s motive, there could be no one else who had a motive to kill Vargas.

The State responds that its remarks constituted a reasonable characterization of the evidence and logical inferences drawn therefrom. Moreover, the State contends, its rebuttal argument was in direct response to and invited by defendant’s closing argument. Finally, the State asserts that, even if its rebuttal argument was improper, it did not result in any prejudice to defendant in light of the overwhelming evidence of his guilt.

In presenting a closing argument, the prosecutor is allowed a great deal of latitude and is entitled to argue all reasonable inferences from the evidence. 
People v. Johnson
, 146 Ill. 2d 109, 143 (1991). The standard of review applied to arguments by counsel is similar to the standard used in deciding whether a plain error was made: comments constitute reversible error only when they engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from those comments. 
People v. Henderson
, 142 Ill. 2d 258, 323 (1990). Here, the jury heard evidence that defendant and Vargas had a physical confrontation just a few hours before Vargas’ body was found. The jury also heard defendant’s own statement where he described his plan to kill Vargas in retaliation for his taking defendant’s cane in the earlier fight, and his successful execution of this plan. The prosecutor’s statement that only one inference could be drawn from these facts was argument of a reasonable inference from the evidence adduced at trial. See 
People v. Cloutier
, 156 Ill. 2d 483, 508 (1993).

Moreover, as the State correctly points out, the prosecutor’s remarks were made in direct response to defendant’s closing argument. During his closing argument, defense counsel argued:

“The real murderer waited in another location. The real murderer was a robber, was a robber who came in there, struck Mr. Vargas, took his shoes, took whatever he had in his pockets because his pockets were turned out. And the only reason that they, the State[,] is going after Mr. Nieves is because of a previous incident that Mr. Laboy testified about. ***

*** [T]here is no physical evidence connecting our client to this murder. There are no fingerprints found in the truck that he allegedly laid and waited for Mr. Vargas to get home. There was no murder weapon recovered. *** That’s because the real murderer does not sit before you. The real murderer is still out on the street–probably wiped the item off and walked with it, that’s why they couldn’t find the murder weapon.”

The prosecutor’s comments during rebuttal that only one person had a motive to kill Vargas based upon the evidence were properly made in response to defense counsel’s closing argument. See 
People v. Hudson
, 157 Ill. 2d 401, 441 (1993) (the prosecutor may respond to comments by defense counsel which clearly invite a response). Further, because the prosecutor’s comments were invited, they cannot be relied upon as error on appeal. 
People v. Brown
, 172 Ill. 2d 1, 43 (1996).

Finally, even if it could be said that the prosecutor’s remarks were improper, we would still find reversal unwarranted. The evidence of defendant’s guilt was substantial enough that we conclude that the jury would have returned a verdict of guilty even if the prosecutor had not made this argument. The remarks are not so prejudicial that it is impossible to say whether the verdict of guilt resulted from these comments. See 
Henderson
, 142 Ill. 2d at 323.

Sentencing Errors

Eligibility Phase

Defendant next contends that his sentence of death must be vacated because the State failed to prove beyond a reasonable doubt that he was eligible for the death penalty. Defendant takes issue with both the trial court’s finding that New York’s first degree manslaughter statute was substantially similar to the Illinois first degree murder statute, and with the jury’s finding of eligibility based upon the aggravating factor of two or more convictions for murder.

The sole aggravating factor advanced by the State for defendant’s death penalty eligibility was that he had been convicted of murdering two or more individuals. 720 ILCS 5/9–1(b)(3)  (West 1996). Section 9–1(b)(3) of the Criminal Code of 1961 authorizes the imposition of the death penalty when “the defendant has been convicted of 
murdering
 two or more individuals under subsection (a) of this Section [first degree murder] or under any law of the United States or of any state which is substantially similar to subsection (a) of this Section.” (Emphasis added.) 720 ILCS 5/9–1(b)(3) (West 1996). Defendant contends that his conviction for manslaughter in New York cannot be used to find him eligible for the death penalty because section 9–1(b)(3) clearly states that a defendant must have been convicted of “murdering” two or more individuals.

This court’s primary objective when construing the meaning of a statute is to ascertain and give effect to the intent of the legislature. 
People v. Robinson
, 172 Ill. 2d 452, 457 (1996). Our inquiry into the legislative intent behind a statute must necessarily begin with the language of the statute.  
People v. Chandler
, 129 Ill. 2d 233, 253 (1989). The statutory language must be given its plain and ordinary meaning, and where that language is clear and unambiguous, we must apply the statute without further aids of statutory construction. 
Robinson
, 172 Ill. 2d at 457. Because the construction of a statute is a question of law, our review is 
de novo
. 
Robinson
, 172 Ill. 2d at 457.

In drafting section 9–1(b)(3), the General Assembly specifically chose to use the word “murder.” Murder is a term of art describing a specific crime. Had the General Assembly intended for homicides not resulting in murder convictions in other states to trigger death penalty eligibility, the legislature would have used a broader term such as “killing” or “homicide.” Instead, the General Assembly specifically required that a defendant be convicted of “murdering” two or more individuals.

The legislature’s intent in section 9–1(b)(3) is clear and unambiguous: in order for a defendant to be eligible for the death penalty, he must have been convicted of 
murdering
, and not simply killing, two or more persons. Defendant’s conviction from New York, upon which his death penalty eligibility was predicated, however, was not for murder but for manslaughter. Clearly, then, defendant does not meet the death penalty eligibility requirements under section 9–1(b)(3) and is entitled to a new sentencing hearing.

The trial court erred when it continued its inquiry into whether the Illinois first degree murder statute and New York manslaughter statute were substantially similar because the threshold requirement that defendant must have been convicted of two “murders” was not met. The “substantially similar” requirement additionally imposed by the legislature in section 9–1(b)(3) refers to substantially similar murder statutes, not offenses other than murder. Whether the New York and Illinois statutes at issue are substantially similar, then, is irrelevant.

The State argues that to strictly construe section 9–1(b)(3)’s requirement that a defendant be convicted of two or more murders is an exaltation of form over substance. We disagree. Criminal statutes must be strictly construed in favor of the accused. 
Chandler
, 129 Ill. 2d at 254. This rule takes on even more significance in light of the capital nature of this case. See 
Chandler
, 129 Ill. 2d at 254. We reject the State’s contention that we should ignore strict construction and hold that, despite the legislature’s specific use of the word “murder,” defendant may be sentenced to death where he has not been convicted of murdering two or more individuals, but rather has been convicted of murder in Illinois and manslaughter in New York. Section 9–1(b)(3) does not allow us to so hold. Furthermore, even if we were to find an ambiguity in section 9–1(b)(3) that would allow us to look outside the clear language of the statute, any such ambiguities must be resolved in favor of the defendant. See 
Robinson
, 172 Ill. 2d at 457.

We thus hold that defendant is ineligible for the death penalty as a matter of law under the aggravating factor of having been convicted of murdering two or more individuals under the Illinois first degree murder statute or under any law of any other state which is substantially similar. 720 ILCS 5/9–1(b)(3) (West 1996). Because our ruling on this issue is dispositive, we find that we need not address defendant’s remaining contentions of sentencing error.

CONCLUSION

For the reasons stated, we affirm defendant’s conviction but vacate defendant’s death sentence and remand to the circuit court for a new sentencing hearing.

Conviction affirmed;

 death sentence vacated;

cause remanded for resentencing.

JUSTICE MILLER, concurring in part and dissenting in part:

I agree with the majority that the defendant’s conviction for first degree murder may be affirmed. I do not agree with the majority’s separate conclusion, however, that the defendant’s death sentence rests on an invalid statutory aggravating circumstance and therefore must be vacated.

The State based the defendant’s eligibility for the death penalty on the multiple-murder aggravating circumstance found in section 9–1(b)(3) of the Criminal Code of 1961 (720 ILCS 5/9–1(b)(3) (West 1996)). That statute authorizes imposition of the death penalty on a defendant who has been found guilty of first degree murder under the following conditions:

“[T]he defendant has been convicted of murdering two or more individuals under subsection (a) of this Section or under any law of the United States or of any state which is substantially similar to subsection (a) of this Section regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts so long as the deaths were the result of either an intent to kill more than one person or of separate acts which the defendant knew would cause death or create a strong probability of death or great bodily harm to the murdered individual or another[.]”

The defendant was convicted in New York in 1994 of manslaughter in the first degree. At the sentencing hearing below, the State contended, and the trial judge agreed, that the New York statute under which the defendant was convicted was substantially similar to the Illinois first degree murder statute. The trial judge therefore ruled that the defendant’s New York conviction could be used together with the conviction for first degree murder in the present case to establish the defendant’s eligibility for the death penalty under section 9–1(b)(3).

The New York statute provided:

“A person is guilty of manslaughter in the first degree when:

(1) with intent to cause serious physical injury to another person, he causes the death of such person or of a third person[.]” N.Y. Penal Law §125.20 (McKinney 1998).

The State argues that the New York offense is substantially similar to the provision in this state that includes within the definition of first degree murder homicides that are committed with intent to “do great bodily harm to that individual or another.” 720 ILCS 9–1(a)(1) (West 1996). Because the New York statute does not call the defendant’s offense “murder,” however, the majority concludes that a conviction under that provision may not be used to establish the requirements of the multiple-murder aggravating circumstance. I do not agree.

In effect, the majority imposes two requirements that must be fulfilled before a conviction from another state may be used to help establish a defendant’s eligibility for the death penalty under section 9–1(b)(3): first, the statute on which the other conviction is based must be substantially similar to section 9–1 of the Criminal Code of 1961, and second, the other state’s offense must also be called “murder.” I believe that the first inquiry alone is sufficient to satisfy the requirements of section 9–1(b)(3). The purpose of that provision is met if the statutes are substantially similar; there is no point in also requiring, as the majority does here, that the offense in the other state be called the same thing as it is in Illinois. If the statutes are substantially similar, that should mark the end of the matter; to also demand that they share the same name adds nothing. I would note that Illinois itself no longer has an offense called simply “murder.” The offense is now known as either first degree murder or second degree murder, and only a conviction for first degree murder is punishable by death.

Our analysis should focus “on the meaning rather than the language” of the two states’ statutes, as this court explained in 
People v. Guest, 
115 Ill. 2d 72, 96 (1986), in determining under section 9–1(b)(3) that the California offense of second degree murder was substantially similar to the Illinois offense of murder. I believe that section 9–1(b)(3) uses the terms “murdering” and “murdered” simply in recognition that an offense that is substantially similar to section 9–1(a)(1) would be considered a form of murder if committed in Illinois. The majority’s reasoning, however, would bar the use of a conviction from another state under a statute that is identical in all respects, except in name, with the offense defined in section 9–1(a). I do not believe that the legislature could have intended that result.

JUSTICES FREEMAN and RATHJE join in this partial concurrence and partial dissent.

JUSTICE FREEMAN, also concurring in part and dissenting in part:

I join Justice Miller’s partial concurrence and partial dissent. I agree that defendant’s conviction for first degree murder must be affirmed. I also believe that defendant’s conviction in the State of New York for first degree manslaughter may be used to impose the death penalty under section 9–1(b)(3) of the Criminal Code of 1961 (720 ILCS 5/9–1(b)(3) (West 1996)). I write separately to point out that the majority has effectively overruled 
People v. Guest
, 115 Ill. 2d 72 (1986), and seriously compromised section 9–1(b)(3).

In 
People v. Guest
, 115 Ill. 2d 72 (1986), this court considered whether a conviction for second degree murder in the State of California could be used as an aggravating factor justifying imposition of the death penalty under section 9–1(b)(3). The defendant maintained that the statutory provisions of Illinois and California defining the offense of murder were not substantially similar. The Illinois statutory provision required proof of intent or knowledge while the California statutory provision required proof of malice aforethought, express or implied. Consequently, the defendant argued that his conviction for second degree murder in California could not be used as an aggravating factor under section 9–1(b)(3).

Initially, we observed that “[i]mposition of the death penalty under [section 9–1(b)(3)] requires a comparative analysis of the murder statutes of Illinois and California.” 
Guest
, 115 Ill. 2d at 92. Under this analysis, we were bound to “determine whether or not conduct which constitutes murder in California would constitute murder in Illinois if it had occurred here.” 
Guest
, 115 Ill. 2d at 92. We rejected the view that our analysis should be limited to the language used in the statutory provisions. We stated:

“The substantial similarity between the murder statutes is not found in the language of the respective statutes but, rather, in the mental states required by each statute in order to prove the offense of murder.” 
Guest
, 115 Ill. 2d at 95.

We then examined case law in California and determined that “the meaning given to express malice under the California murder statutes is virtually identical to the meaning given to intent as found in section 9–1(a)(1) of our murder statute [Ill. Rev. Stat. 1979, ch. 38, par. 9–1(a), now codified at 720 ILCS 5/9–1(a) (West 1998)].” 
Guest
, 115 Ill. 2d at 95. Also, “the meaning given to implied malice under California law closely tracks the meaning given to knowledge under Illinois law.” 
Guest
, 115 Ill. 2d at 96.

In summary, we stated:

“Our comparative analysis of the relevant statutes and case law in Illinois and California convincingly demonstrates that both jurisdictions require the same mental states–intent or knowledge–in order for a killing to constitute murder. In both jurisdictions, intentional killings can be reduced from murder to voluntary manslaughter under certain factual circumstances. [Citations.] Moreover, both jurisdictions treat nonintentional, nonknowing killing (other than felony murder) as involuntary manslaughter. [Citations.] We conclude, therefore, that the mental states required to establish murder under Illinois and California law are substantially similar for the purposes of imposing the death penalty under the multiple-murder, aggravating-factor provision.” 
Guest
, 115 Ill. 2d at 98-99.

See also 
People ex rel. Daley v. Strayhorn
, 121 Ill. 2d 470 (1988) (the 
mens rea
 needed to support a murder conviction in Rhode Island is substantially similar to the Illinois definitions of “intent” and “knowledge” required in section 9–1(a)).

Our analysis in 
Guest
 focused

“on the meaning rather than the language of the Illinois and California murder statutes. That this is the proper approach is made clear by the committee comments accompanying the current murder statute in Illinois as well as by prior decisions of this court.” 
Guest
, 115 Ill. 2d at 96.

Following 
Guest
, the proper inquiry in the case at bar is whether New York’s first degree manslaughter statute is substantially similar to Illinois’ first degree murder statute. In other words, would conduct which constitutes first degree manslaughter in New York constitute murder in Illinois if it had occurred here? As shown by Justice Miller in his partial concurrence and partial dissent, the answer to this question is yes.

The majority elects not to follow 
Guest
. Rather than looking to the mental states required by the New York and Illinois statutes, the majority’s analysis is focused on the language of the statutes. The majority states:

“In drafting section 9–1(b)(3), the General Assembly specifically chose to use the word ‘murder.’ Murder is a term of art describing a specific crime. Had the General Assembly intended for homicides not resulting in murder convictions in other states to trigger death penalty eligibility, the legislature would have used a broader term such as ‘killing’ or ‘homicide.’ Instead, the General Assembly specifically required that a defendant be convicted of ‘murdering’ two or more individuals.” Slip op. at 16.

The majority concludes that “in order for a defendant to be eligible for the death penalty, he must have been convicted of 
murdering
, and not simply killing, two or more persons.” Slip op. at 16. Since defendant was convicted of “first degree manslaughter” and not murder, defendant was not eligible for the death penalty.

The majority’s approach to section 9–1(b)(3) is overly narrow. The majority holds, in essence, that if State X selects a name other than murder for a crime which would constitute murder if committed in Illinois, the conviction in State X cannot form the basis for imposition of the death penalty in Illinois. Perhaps State X has called murder “homicide,” “manslaughter,” “asesinato,” or “homicidio.” Although the act would constitute murder in Illinois, the name used by State X is more important.

Section 9–1(b)(3) provides for the imposition of the death penalty when a defendant has been convicted under “any law of the United States or of any state which is 
substantially similar
 to subsection (a).” (Emphasis added.) 720 ILCS 5/9–1(b)(3) (West 1996). To require that a defendant must have been convicted of “murder” in another state to justify imposition of the death penalty in Illinois is to ignore the 
substantially similar
 language contained in section 9–1(b)(3). The majority has effectively overruled 
Guest
 and has compromised section 9–1(b)(3).  I must disagree.

JUSTICE RATHJE, also concurring in part and dissenting in part:

I join Justice Miller’s partial concurrence and partial dissent. I write separately to point out an additional flaw in the majority’s analysis of whether defendant was properly found eligible for the death penalty.

The majority begins its analysis from a wholly invalid premise. After noting that the General Assembly chose to use the word “murder” in section 9–1(b)(3), the majority states, “Murder is a term of art describing a specific crime.” Slip op. at 16. I am unsure what the majority means by this, given that the very reason we have to decide this issue is that the term “murder” does 
not
 describe a specific crime. Illinois defines the term one way, and New York defines it another.

By stating that “murder is a term of art describing a specific crime,” the majority must be referring to either the Illinois definition of murder or the common law definition of murder. Defendant’s first degree manslaughter conviction from New York fits both of those definitions. As Justice Miller points out, the New York definition of first degree manslaughter is substantially similar to Illinois’ definition of first degree murder in section 9–1(a)(1). Further, the conduct defendant was convicted of in New York would fit the common law definition of murder. As Professor La Fave explains,

“Murder is a common law crime whose complete development required several centuries. Though murder is frequently defined as the unlawful killing of another ‘living human being’ with ‘malice aforethought,’ in modern times the latter phrase does not even approximate its literal meaning. Hence it is preferable not to rely upon that misleading expression for an understanding of murder but rather to consider the various types of murder (typed according to the mental element) which the common law came to recognize and which exist today in most jurisdictions: (1) intent-to-kill murder; (2)
 intent-to-do-serious-bodily-injury murder
; (3) depraved-heart murder; and (4) felony murder.” (Emphasis added.) 2 W. LaFave, Substantive Criminal Law §7.1, at 181 (1986).

Thus, whether the majority is referring to the Illinois definition of murder or the generally recognized common law definition of murder, defendant’s New York conviction clearly fits within that definition and was properly used to render defendant death eligible.

The majority then states, “Had the General Assembly intended for homicides not resulting in murder convictions in other states to trigger death penalty eligibility, the legislature would have used a broader term such as ‘killing’ or ‘homicide.’ ” Slip op. at 16. I disagree. I believe that if the General Assembly intended for homicides not resulting in murder convictions to trigger death penalty eligibility, the legislature would have required only that the statute defining the aggravating offense in another jurisdiction be “substantially similar” to the Illinois first degree murder statute. In fact, that is exactly what the legislature did.